Gilbert MORENO, Plaintiff-Appellant,

v.

Gerald C. HENCKEL, Jr., et al.,
Defendants-Appellees.

No. 28644.

United States Court of Appeals,
Fifth Circuit.

Sept. 23, 1970.

Pete Tijerina, Mario G. Obledo, San Antonio, Tex., for plaintiff-appellant; Alan Exelrod and James Dean Allen, San Antonio, Tex., on the brief.

Earle Cobb, Jr., Crawford Reeder, San Antonio, Tex., for defendants-appellees.

Before WISDOM, AINSWORTH, and CLARK, Circuit Judges.

WISDOM, Circuit Judge.

The plaintiff, Gilbert Moreno, brings this action under the Civil Rights Act of 1871, now codified as 42 U.S.C. § 1983,[1] for injunctive relief, a declaratory judgment, and damages arising from deprivation of his First and Fourteenth Amendment rights. Jurisdiction is conferred by 28 U.S.C. § 1343.[2] The district court not only abstained, but dismissed the complaint on the ground that a remedy was available to the plaintiffs in the Texas courts.[3] That is not the law. "The fact that a state remedy is available is not a valid basis for federal court abstention." Hargrave v. Kirk, M.D.Fla.1970, 313 F.Supp. 944. (Dyer,

1. Section 1 of the Civil Rights Act of 1871, (ch. 22, § 1, 17 Stat. 13), now section 1983 of Title 42 of the U.S.Code provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

2. § 1343. *Civil rights and elective franchise*

The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

\*　　\*　　\*　　\*　　\*

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

3. Ordinarily an abstaining court retains jurisdiction. Under England v. Louisiana State Board of Medical Examiners, 1964, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440, the plaintiff in theory may return to the federal courts for resolution of federal questions, if he properly reserves his right to do so. In the instant case the Court's order does state that the dismissal is "without prejudice to plaintiff's right to request that this cause be reinstated in the event the State Courts refuse, upon the filing of a proper petition therein,

J., for the three-judge court). Here, the plaintiff alleges that against a background of prejudice against Mexican-Americans he was deprived of his rights to freedom of speech and petition and association; that he was discharged as a result of proceedings lacking in due process; that the city regulation under which he was discharged for "conduct prejudicial to good order" [4] is unconstitutional on its face for overbreadth and vagueness. This action is one that is peculiarly appropriate for recognition of a litigant's right to choose a federal forum in which to litigate denial of federal rights. "Civil rights [cases] are the least likely candidates for abstention." [5] And as Judge Dyer said in *Hargrove,* "In such a case it is the duty of a federal court to exercise its jurisdiction". Monroe v. Pape, 1961, 365 U.S. 167, 183, 81 S.Ct. 473, 5 L.Ed.2d 492; McNeese v. Board of Education, 1963, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622; and Zwickler v. Koota, 1967, 389 U.S. 241, 251, 88 S.Ct. 391, 19 L.Ed.2d 444, the three decisions principally relied on in *Hargrove,* control this case.

## I.

The City of San Antonio employed Gilbert Moreno October 7, 1968, as a security guard at the HemisFair Plaza, a city-operated World's Fair. His position entitled him to civil service status under a city ordinance. During the spring of 1969 the guards, many of whom were Mexican-American, became dissatisfied with some of the working conditions at the Plaza. The complaint alleges, and the Civil Service Commission later found, that the City had never informed Moreno of any procedure for redress of grievances. Moreno and another guard therefore went to Erasmo Andrade, a private citizen who is the head of the Federation For the Advancement of Mexican-Americans, for advice on how to make known their grievances to the City. On Andrade's advice, Moreno circulated two petitions among the twenty-four guards. The first demanded the immediate dismissal of Captain William Martin as head of the Security Guards because, among other reasons, he discriminated against "minority groups when promoting employees into higher paying and responsible positions." [6]

to consider the constitutional questions raised, or delay a decision in connection therewith for an inordinate length of time".

4. Rule XIX, Section 102, Article 8 of the Revised Personnel Rules of the City of San Antonio.

5. "While the [abstention] doctrine has not been entirely abnegated and instances may still arise in which it will be appropriate, see Harrison v. NAACP, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959), Railroad Comm'n [of Texas] v. Pullman Co., supra, [312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941)], it is reasonable to conclude that cases involving vital questions of civil rights are the least likely candidates for abstention, e. g. McNeese v. Board of Education, supra, 373 U.S. [668] 673–674, 83 S.Ct. 1433, [10 L.Ed. 2d 622]." Wright v. McMann, 2 Cir. 1967, 387 F.2d 519, 525. (Kaufman, J.) "These observations [on the value of the abstention doctrine] call for qualification in one instance: the rights of action specially conferred by Congress in the Civil Rights Laws. There Congress has declared the historic judgment that

within this precious area, often calling for a trial by jury, there is to be no slightest risk of nullification by state process. *The danger is unhappily not past.* It would be moving in the wrong direction to reduce the jurisdiction in this field—not because the interest of the state is smaller in such cases, but because its interest is outweighed by other factors of the highest national concern. Needless to say, to formulate the scope of the exception is no drafting problem; its measure is the rights of action given by the Civil Rights Laws." Wechsler, Federal Jurisdiction and the Revision of the Judicial Code, 13 Law and Contemporary Problems, 216, 230 (1948).

See Note, Federal Question Abstention, 80 Harv.L.Rev. 604, 607 (1967).

6. The petition Moreno circulated gave the following reasons:
"1. He has failed to establish grievances procedures to hear and remedy problems and grievances as submitted by his subordinates.
2. Failed to honor the Security Readings.
3. Refuses to communicate and establish dialogue with the Security Guards.

The second petition was similar to the first except that it demanded the dismissal of the Assistant Director of Convention and Municipal Facilities. Moreno alleged that he gave every guard a full opportunity to read the petitions and informed each man that the petitions would be submitted to the City Council; the petitions were addressed "TO THE CITY COUNCIL". On July 3 Andrade presented the petitions to the Council "in an orderly fashion", according to the stipulation. On July 9 Moreno received a letter from the Director of Convention and Municipal Facilities informing him that he had been dismissed for "conduct prejudicial to good order". Specifically the letter charged Moreno with (1) "voluntarily seeking and securing the outside aid and influence of one Erasmo Andrade who has no official connection with the Government of the City of San Antonio or the administration of its personnel"; (2) having "circulated among [his] fellow employees a petition or petitions listing alleged grievances and requesting the dismissal of such supervisors"; (3) having "misrepresented the nature and objective of the petitions by leading [the fellow guards] to believe that the purpose * * * was to secure for them a hearing with the Security Guards Captain"; (4) and having "surrendered possession of the petitions to Erasmo Andrade who thereafter presented them to the City Council".

The letter states that "all of [these actions] were contrary to the grievance procedures of the City of San Antonio".

The letter of dismissal advised Moreno that the Civil Service Committee would give him a hearing if he requested one. On his request, the Commission conducted a hearing[7] at the conclusion of which the Commission by a two to nothing vote found "there is but a mere scintilla of evidence to support the charges against the petition" that he had "misled his fellow employees into signing something other than as contained in the petition" and, moreover, he had no knowledge of established Grievance Procedures. The Commission concluded that it was unnecessary to base its decision on Moreno's First Amendment rights. It recommended that he be reinstated to his former classified position as a Security Guard of the Hemis-Fair Grounds. The Commission's decisions however are advisory only; the decision-making power rests with the City Manager, under Personnel Rules for the City of San Antonio.

On August 15, 1969, Gerald C. Henckel, City Manager, rejected the Commission's recommendation and upheld Moreno's dismissal. Henckel was not present at the Commission's hearing. His letter to the Civil Service Commission sustaining the action of the Direc-

4. Discriminates the minority groups when promoting employees into higher paying and responsible positions.
5. Captain Martin is hard of hearing and is a hazard to his line of duty.
6. Refuses to allow employees to go over his position; complains to hire us.
7. Captain Martin has failed to perform his duties properly.
8. Because of Captain Martin behavior the morale of the Security Guard is very low.
We the Security Guard demand that Captain William Martin be replaced by a person not presently employed as a Security Guard at HemisFair Plaza.
Please indicate if you are for or against the merger of the Security Guards with the Tower Guards by Writing for or against after your signature."

7. The Commission stated: "The gravamen of the charges is that on or about June 20, 1969, the Petitioner undertook to register grievances against Supervisors William Martin and William C. Lindquist, by seeking the outside aid of one Erasmo Andrade, who has no official connection with the City of San Antonio. That in furtherance of this Petition, he misrepresented the nature and object of the Petition by allegedly inducing other Petitioners to believe that the purpose of the Petition was in truth and fact to seek a Hearing with a Captain Martin and that these Grievance Procedures were contrary to established Grievance Procedures of the City of San Antonio."

tor of Municipal Facilities states that he based his decision on the evidence presented at the hearing and "other evidence not submitted at the hearing".

Moreno then filed this action under Section 1983. He named as defendants G. C. Henckel, City Manager and F. W. Vickers, Director of Convention and Municipal Facilities, each individually and in his official capacity; and the City of San Antonio. He asked for an injunction ordering his reinstatement without loss of pay and without loss of seniority and other employment benefits; $50,000 in damages; and a declaratory judgment declaring that the defendants' actions were unconstitutional as applied to the plaintiff and that the City regulations upon which they are premised are unconstitutional on their face. After a hearing, preceded by the parties' stipulating to the facts, the district court dismissed the complaint. In the order of dismissal the court stated that an "adequate state court review of an administrative order is available to plaintiff" and, "bearing in mind the usual rule of comity, this is a proper case for the application of the abstention doctrine".

## II.

We note, initially, that the district judge failed to take into account the First Amendment. From the bench he stated his understanding that "in this case plaintiff is claiming that his constitutional right of due process was violated". Again, in his order dismissing the cause, he stated that "this case involves a claim that plaintiff's constitutional right of due process was violated". Procedural due process is involved, for it is undisputed that the City Manager decided Moreno's case partly on evidence that was not brought forward at the Civil Service Commission hearing. But the main thrust of the plaintiff's case derives from the First Amendment.[8] The important issue is whether the plaintiff can be compelled to assert First Amendment Rights in state courts before being allowed access to a federal forum.

## III.

The district court based its holding on the mistaken theory that the plaintiff cannot choose a federal forum for assertion of federal rights if a state remedy is available. He is not alone in this error.[9]

---

8. It is clear from the district judge's colloquies with counsel he had reference to the alleged lack of a fair hearing, not to the incorporation of the First Amendment in the due process clause of the Fourteenth Amendment.

 In the complaint the first three causes of action are: (1) "Firing the Plaintiff upon the grounds that he associated with a certain individual [Andrade] for the purpose of making known legitimate grievances violates the First Amendment guarantee of Freedom of Association; (2) Firing the Plaintiff upon grounds that Plaintiff circulated a petition of grievances violates the First Amendment guarantee of freedom of Speech; (3) Firing the Plaintiff on the grounds that Plaintiff attempted to make known grievances to the City violates the First Amendment guarantee of a citizen's right to petition for redress of grievances."

9. See, for example, Schwartz v. Galveston Independent School District, S.D.Tex. 1970, 309 F.Supp. 1034. That opinion closely follows an analysis of Monroe v.

Pape and a suggested approach to § 1983 proposed in a Note, Limiting the Section 1983 Action in the Wake of Monroe v. Pape, 82 Harv.L.Rev. 1489 (1969). The Note recognizes, however, that: "Supreme Court cases since *Monroe* have indicated that adequacy of state remedies should not bar relief. In consequence, exhaustion of admittedly adequate state remedies does not constitute a prerequisite to maintaining a section 1983 action in federal court." Note, 82 Harv.L.Rev. at 1487. It is true, however, that until the Supreme Court decided Monroe v. Pape, the statute was narrowly construed and seldom litigated. See Chevigny, Section 1983: A Reply, 83 Harv.L.Rev. 1352 (1970) in which the author accepts the challenge of the Note and undertakes to set forth the rationale for the Monroe-McNeese approach to § 1983.

Hall v. Garson, 5 Cir. 1970, 430 F.2d 430, and Harkless v. Sweeny Independent School Dist., 5 Cir. 1970, 427 F.2d 319, have rejected the underlying rationale of *Schwartz*.

**1304**

■ Section 1983, as it now reads, is substantially unchanged from a provision of the Ku Klux Klan Act of 1871, sometimes called "the third force bill". Congress debated the law at length. There is no doubt that the law was aimed at southern states where remedies were nonexistent or inadequate for Negroes or Northerners asserting civil rights under the Civil War Amendments. There is also no doubt Congress fully understood that the statute extended federal authority over matters previously within the exclusive jurisdiction of state courts. In Monroe v. Pape the Supreme Court carefully considered the legislative history of § 1983.[10] The Court found "threads of many thoughts running through the debates", but that "the section had three main aims". First, "it might, of course, override certain kinds of state laws", that is, "invidious legislation by States against the rights or privileges of citizens of the United States". Second, "it provided a remedy where state law was inadequate". "The *third* aim was to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice."

*The significant fact is that Monroe v. Pape does not come within any of the "three main aims".* In that case Chicago police officers, without a warrant,

broke into the plaintiff's home and subjected him to various abuses.[11]

The Supreme Court, through Mr. Justice Douglas, *did not say or imply that the state procedures or courts in Illinois were inadequate to afford redress.* What the court did say, 365 U.S. at 183, 81 S.Ct. at 482, was:

Although the legislation was enacted because of the conditions that existed in the South at that time, it is cast in general language and is as applicable to Illinois as it is to the States whose names were mentioned over and again in the debates. It is no answer that the State has a law which if enforced would give relief. The federal remedy is *supplementary* to the state remedy, and the latter need not be first sought and refused before the federal one is invoked. Hence the fact that Illinois by its constitution and laws outlaws searches and seizures is no barrier to the present suit in the federal court. (Emphasis added.)

This supplementary function of the act is a fourth main aim or perhaps an overriding purpose inherent in the general terms of the act.

■ A statute cast in general terms is not limited to effectuating only the specific purposes that brought it into being. The Fourteenth Amendment

---

10. For legislative and judicial history see Monroe v. Pape, 365 U.S. 167, 171–183, 81 S.Ct. 473, 5 L.Ed.2d 492; Note, Limiting the Section 1983 Action in the Wake of Monroe v. Pape, 83 Harv.L.Rev. 1486 (1970); Comment, Exhaustion of State Remedies Under the Civil Rights Act, 68 Colum.L.Rev. 1201 (1968); Shapo, Constitutional Tort: Monroe v. Pape, and the Frontiers Beyond, 60 Nw.U.L.Rev. 277 (1965); Nelson, Section 1983: A Civil Remedy for the Protection of Federal Rights, 39 N.Y.U.L.Rev. 839 (1964); Note, The Civil Rights Act of 1871: Continuing Validity, 40 Notre Dame L.Rev. 70 (1964); Gressman, The Unhappy History of Civil Rights Legislation, 50 Mich. L.Rev. 1323, 1336–43 (1952).

11. Mr. Justice Frankfurter, in his dissenting opinion, 365 U.S. at 203, 81 S.Ct. at 492, narrated the facts as follows: [T]hirteen city policemen broke through

two doors of his apartment at 5:45 a. m., woke him and his wife with flashlights, "forced them at gunpoint to leave their bed and stand naked in the center of the living room * * * roused the six Monroe children and herded them into the living room * * *. Detective Pape struck Mr. Monroe several times with his flashlight, calling him 'nigger' and 'black boy' * * * another officer pushed Mrs. Monroe * * * other officers hit and kicked several of the children and pushed them to the floor * * * the police ransacked every room * * * Mr. Monroe was then taken to the police station and detained on 'open' charges for ten hours * * * he was not advised of his procedural rights * * * he was not permitted to call his family or an attorney * * * he was subsequently released without criminal charges having been filed against him."

itself, on which the Ku Klux Act was based, came into being to protect Negroes against discrimination. Of course, its applicability cannot now be limited to deprivations of rights involving discrimination against Negroes.[12] Section 1979 of the Civil Rights Act of 1871 (now § 1983) was enacted under authority of Section 5 of the Fourteenth Amendment, debated within the context of the Fourteenth Amendment, and entitled "an Act to Enforce the Fourteenth Amendment". But there is no doubt that First Amendment rights and other federal constitutional rights incorporated in the Fourteenth Amendment come within the ambit of Section 1983.[13]

Whatever this senator or that senator may have said in the debates, the language of the act is unqualified and provides no basis for a judge-made limitation requiring exhaustion of state remedies. The act was not one artfully phrased so as *not* to disturb the relationship between the States and the Nation. If there is one thing certain about the legislative history of the Act, it is that Congress, open-eyed, deliberately set out to alter the so-called "delicate balance" between the state and the federal government so that federal courts could effectively protect federal rights.[14]

The necessary effect of § 1983 is to make federal courts accessible for the protection of federal personal rights.[15] Without it, one would find it difficult to explain to the Mexican-American plaintiff in this case that rights which come to him in the Bill of Rights and the Fourteenth Amendment cannot, in the first instance, be protected in the federal courts. It is beside the point to say that federal question jurisdiction did not exist until 1875,[16] or that state courts are as competent as federal courts to construe the constitution and to give appropriate relief. Congress, in unqualified terms, has provided a federal forum for civil wrongs of constitutional dimensions and for violations of specific civil rights laws. "In * * * expanding federal judicial power [after the Civil War], Congress imposed the duty upon all levels of federal judiciary to give due respect to a suitor's choice of a federal forum for the hearing and decision of his federal constitutional claims." *Zwickler*, 389 U.S. at 245–249, 88 S.Ct. at 395, 19 L.Ed.2d 444. When Congress has intended to limit federal jurisdiction by requiring exhaustion of state judicial remedies, it has done so in explicit language. For example, see 28 U.S.C. § 2254 (habeas corpus for state prisoners); 28 U.S.C. § 1342 (state rate orders); 28 U.S.C. § 1341 (state taxes).

In McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622, Negroes in an Illinois school district requested a federal court to order integration according to an approved plan. The Seventh Circuit affirmed a dismissal of the complaint for failure of the plaintiffs to exhaust remedies under the

---

12. In a voting rights case, Mr. Justice Holmes, writing for a unanimous court declared that the Fourteenth Amendment "while it applies to all, was passed, as we know, with a special intent to protect the blacks from discrimination against them". Nixon v. Herndon, 1927, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759.

13. *Cf.* Hague v. CIO, 1939, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423, in which the Supreme Court enjoined various Jersey City officials from interfering with the plaintiff's First Amendment freedom to discuss their labor rights under the National Labor Relations Act.

14. See the strong comment by Judge Will in Landry v. Daley, E.D.Ill.1968, 288

F.Supp. 200, 223. *See also* Note, Section 1983: A Civil Remedy for the Protection of Federal Rights, 39 N.Y.U.L. Rev. 839, 942 (1964).

15. "The scope of the present jurisdiction [of § 1983] may be stated in a nutshell: a person may resort to the federal court to remedy an abuse by a state official in a matter of personal rights protected by the Federal Constitution or laws." Chevigny, Section 1983 Jurisdiction: A Reply, 83 Harv.L.Rev. 1352 (1970). This article sets forth the policy considerations in favor of the holding in Monroe v. Pape.

16. The Act of March 3, 1875, 18 Stat. 470.

state education law. The Supreme Court gave short shrift to the notion that relief under § 1983 may be defeated because of a plaintiff's failure to exhaust state remedies. Mr. Justice Douglas again wrote for the Court. Significantly, after listing "the three main aims" referred to in Monroe v. Pape, he added, 372 U.S. 672, 83 S.Ct. 1435:

> *and* to provide a remedy in the federal courts supplementary to any remedy any State might have.

The opinion continues:

> We would defeat those purposes if we held that assertion of a federal claim in a federal court must await an attempt to vindicate the same claim in a state court. The First Congress created federal courts as the chief— though not always the exclusive—tribunals for enforcement of federal rights. The heads of jurisdiction of the District Court, at the start limited, are now numerous. * * * ¶ As the beneficiaries of the Fourteenth and Fifteenth Amendments became articulate and the nationalist needs multiplied, the heads of jurisdiction of the District Courts increased, and that increase was a measure of the broadening federal domain in the area of individual rights.

373 U.S. at 672, 83 S.Ct. at 1436.

In Damico v. California, 1967, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647, 648, the plaintiffs challenged a rule under the California Aid to Dependent Children program which required a three months waiting period after the father's desertion before benefits could be received. The plaintiffs sued under the Civil Rights Act (§ 1983) for a declaratory judgment, injunctive relief, and damages. A three-judge court dismissed the complaint for failure of the plaintiffs to exhaust adequate state administrative remedies. In a one paragraph per curiam opinion the Supreme Court reversed, treating the question as one governed by settled law:

> * * * The three-judge District Court dismissed the complaint solely

because "it appear[ed] to the Court that all of the plaintiffs [had] failed to exhaust adequate administrative remedies." This was error. In McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622, noting that one of the purposes underlying the Civil Rights Act was "to provide a remedy in the federal courts supplementary to any remedy any State might have," id., at 672, 83 S.Ct. [1433] at 1435 [10 L.Ed.2d at 625], we held that "relief under the Civil Rights Act may not be defeated because relief was not first sought under state law which provided [an administrative] remedy," id., at 671, 83 S.Ct. [1433] at 1435 [10 L.Ed.2d at 625]. See Monroe v. Pape, 365 U.S. 167, 180–183, 81 S.Ct. 473, 5 L.Ed.2d 492, [501].

389 U.S. 416 at 417, 88 S.Ct. 526 at 527, 19 L.Ed.2d 647, at 648.

In Houghton v. Shafer, 1968, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319, a state prisoner alleged that prison authorities had violated § 1983 by depriving him of legal materials which he was using to prepare an appeal. The district court dismissed the complaint on the ground that state administrative remedies had not been exhausted. The Court of Appeals for the Third Circuit affirmed. The Supreme Court reversed. The Court noted that resort to these remedies would be to demand a futile act, because the prison rules were strictly enforced throughout the entire Pennsylvania correctional system. But the Court did not rest its holding on that ground. The Court said: "In any event, resort to these remedies is unnecessary in light of our decisions in Monroe v. Pape, McNeese v. Board of Education, and Damico v. California." (citations omitted). 392 U.S. at 640, 88 S.Ct. at 2120.

*McNeese, Damico,* and *Houghton* are strong authority for the appellant's position, for in these cases the Court applied the *Monroe* holding to state *administrative* remedies. There are good reasons in favor of requiring exhaustion of ad-

ministrative remedies which are not applicable to exhaustion of state judicial remedies.[17] Here, Moreno did all he could do administratively. He knew nothing about grievance procedures. He requested and received a civil service hearing. After his dismissal by the City Manager, he was forced to choose between one court and another court to decide his rights under the Civil Rights Act. He made the natural choice. His case turns upon federal rights of a particularly high order.

There is a strong national interest in preserving rights derived from national citizenship and in adjudicating expeditiously these cases without intervening delays incident to a first testing in state courts.[18] In recognition of this interest, Congress unqualifiedly vested federal courts with jurisdiction to try Moreno's case.

## IV.

■■■■■■ The district court dismissed the complaint on the assumption of a necessary relationship between exhaustion of state *judicial* remedies and the abstention doctrine. But exhaustion of state remedies as a prerequisite to con-

sidering a case on the merits is a jurisdictional or a pseudo-jurisdictional requirement. On the other hand, the abstention doctrine assumes that the court has jurisdiction, that is, that there is no general rule forbidding the court to act absent exhaustion of state judicial remedies. If there were such a general rule the Supreme Court would not limit the application of the doctrine to special circumstances. The abstention doctrine is an exception to the litigant's choice of forum, applied "only in narrowly limited, 'special circumstances'." *Zwickler,* 389 U.S. at 248, 88 S.Ct. at 395, 19 L. Ed.2d 444.

In an important study of federal courts, the authors observed that when Congress conferred federal jurisdiction on federal courts under the Act of March 3, 1875,

Congress gave the federal courts the vast range of power which had lain dormant in the Constitution since 1789. These courts ceased to be restricted tribunals of fair dealing between citizens of different states and became the *primary* and powerful reliances for vindicating every right giv-

17. The rationale for this distinction is that until the administrative process is complete, it cannot be certain that the party will need judicial relief, but when the case becomes appropriate for judicial determination, he may choose whether he wishes to resort to a state or federal court for such relief. * * *" Wright, Federal Courts (2nd Ed. 1970), p. 187. Professor Wright, citing McNeese, noted, "However where plaintiff is suing for a deprivation of civil rights, under 28 U.S.C.A. § 1343, and his claim is based entirely on federal law, he need not exhaust even state 'administrative' remedies. * * *" *Id.*

"The Supreme Court in *Damico* appears to have eliminated the exhaustion requirement in suits under the Civil Rights Act." Even in cases where there may be a state administrative remedy: " * * * There is a strong federal interest in adjudicating these cases immediately, without any exhaustion of state procedures. To contend that such an approach disregards the proper distributor of responsibility under the federal system is to ignore a trend toward increasing ju-

dicial sensitivity to the desirability of providing an expeditious remedy for the protection of federal rights. Furthermore, if the plaintiff is required to proceed first through the state agency, there is a danger that the agency proceedings will terminate in an individual settlement which satisfies the complaint, but neither changes the rule nor subjects it to external scrutiny. Where this happens, others who, because of fear, ignorance, or lack of resources, fail to mount challenges of their own, continue to be governed by a rule of questionable constitutionality." Note, Exhaustion of State Remedies Under the Civil Rights Act, 68 Colum.L.Rev. 1201, 1208 (1968).

18. In 1947, Professor Robert Carr suggested in his book, Federal Protection of Civil Rights (1967) p. 204, that the Supreme Court should read into the Constitution the principle that our basic civil rights are federal rights, entitled to protection by the federal government:

It is neither a distortion of constitutional principles nor a perversion of

en by the Constitution, the laws, and treaties of the United States.[19]

The Supreme Court quoted this statement with approval in Zwickler v. Koota, 1967, 389 U.S. at 247, 88 S.Ct. 391, then referred to § 1983, and observed:

The judge-made doctrine of abstention, first fashioned in 1941 in Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971, sanctions such escape only in narrowly limited "special circumstances." Propper v. Clark, 337 U.S. 472, 492, 69 S. Ct. 1333, 1344, 93 L.Ed. 1480, [1496]. One of the "special circumstances"—that thought by the District Court to be present in this case—is the susceptibility of a state statute of a construction by the state courts that would avoid or modify the constitutional question. Harrison v. NAACP, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152. Compare Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377. But we have here no question of a construction of § 781–b that would "avoid or modify the constitutional question."

389 U.S. at 250, 88 S.Ct. at 395–396. Here too we have no construction of any statute or ordinance that would modify the first amendment questions and, as in *Zwickler,* the ordinance is attacked as overbroad. The Court added: "These principles have particular significance when, as in this case, the attack upon the statute on its face is for repugnancy to the First Amendment. In such case to force the plaintiff who has commenced a federal action to suffer the delay of state court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect." 389 U.S. at 252, 88 S.Ct. at 397–398.

In the most recent abstention case in the Supreme Court Mr. Justice Douglas, writing for a unanimous court, declared:

\* \* \* Abstention certainly involves duplication of effort and expense and an attendant delay. See England v. Louisiana State Board, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440. That is why we have said that this judicially created rule which stems from Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971, should be applied only where "the issue of state law is uncertain." Harman v. Forssenius, 380 U.S. 528, 534, 85 S.Ct. 1177, 1182, 14 L.Ed.2d 50. Moreover, we said in Zwickler v. Koota, 389 U.S. 241, 248, 88 S.Ct. 391, 395, 19 L.Ed.2d 444, that abstention was applicable "only in narrowly limited 'special circumstances,' ", citing Propper v. Clark, 337 U.S. 472, 492, 69 S.Ct. 1333, 1344, 93 L.Ed. 1480. In *Zwickler,* a state statute was attacked on the ground that on its face it was repugnant to the First Amendment; and it was conceded that state court construction could not render unnecessary a decision of the First Amendment question. 389 U.S., at 250, 88 S.Ct. 391.

Reetz v. Bozanich, 1970, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68.

The questions in this case are *all* federal questions. The plaintiff's primary contention is that he was deprived of his First Amendment rights. His secondary contention is that he was deprived of procedural due process. For good measure, the plaintiff also alleges that under the First and Fourteenth Amendments, the City regulations upon which the complaint is predicated are overbroad and therefore unconstitutional on their face. In substance, therefore, there are no state issues, no issues more

---

the purposes of our Constitution to say that in a democratic society citizens must enjoy basic rights such as freedom to discuss public affairs, and that the central government must possess sufficient power to protect these rights—

particularly when local governments are unable or unwilling to protect them.

19. Frankfurter and Landis, The Business of the Supreme Court: A Study in the Federal Judicial System, (1928).

appropriately decided by state courts than by federal courts.

Mr. Justice Harlan, in a concurring opinion in *Zwickler* has pointed out that the Supreme Court has approved abstention in situations when "the federal constitutional issue might be mooted or 'presented in a different posture' by a state court determination of pertinent state law." Or "in situations in which the exercise of jurisdiction by a federal court would disrupt a state administrative process; interfere with the collection of state taxes, or otherwise create 'needless friction' between the enforcement of state and federal policies". 389 U.S. at 455, 456, 88 S.Ct. at 400. The present situation is within none of these categories. There are no pending administrative proceedings to disrupt. There are no legal proceedings pending or about to be brought in the state courts.

 Even when criminal proceedings may be brought or have been brought in state courts, abstention serves no legitimate purpose when the state action has a "chilling effect" on First Amendment rights. Dombrowski v. Pfister, 1965, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22. That case involved protection of the rights of free speech and free association. The court was concerned not only for Dombrowski but for all others who might be intimidated by the irremediable threat of groundless prosecution of Dombrowski for asserting his First Amendment rights. Here a groundless discharge of one of the Mexican-American guards for protesting against discrimination would have a chilling effect upon all city employees and especially upon the twenty-four HemisFair Security Guards.

We stand with Chief Judge Murrah of the Tenth Circuit:

We yet like to believe that wherever the Federal courts sit, human rights

under the Federal Constitution are always a proper subject for adjudication, and that we have not the right to decline the exercise of that jurisdiction simply because the rights asserted may be adjudicated in some other forum.[20]

Stapleton v. Mitchell, D.C., 60 F.Supp. 51, 55, app. dismd. per stipulation Mitchell v. McElroy, 326 U.S. 690, 66 S.Ct. 172, 90 L.Ed. 406.

### IV.

 Under Monroe v. Pape no action for damages will lie against a municipality for acts committed in performance of its governmental functions. The City of San Antonio's immunity from liability of damages, however, does not affect the declaratory and injunctive relief, nor the possible liability of the individual defendants.

 We follow *Zwickler* in holding that the district court has the duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunction. Should the appellant's prayer for declaratory relief prevail, it will be the task of the district court on remand to decide whether an injunction will be necessary or appropriate.

We express no view with respect to the appropriateness of declaratory relief in the circumstances of this case and with respect to the constitutionality of the acts alleged to have deprived the plaintiff of his First and Fourteenth Amendment rights or of the constitutional validity of the allegedly overbroad ordinance of the City of San Antonio.

The judgment of the district court is reversed and the case is remanded for further proceedings consistent with this opinion.

---

**20.** The Supreme Court quoted this statement with approval in McNeese, 373 U.S. at 674, n. 6, 83 S.Ct. 1433, 10 L.Ed.2d 622. It is also quoted with approval in Browder v. Gayle, M.D.Ala.1956, 142 F. Supp. 707 (three-judge case), aff'd 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114.