McNEESE ET AL. *v.* BOARD OF EDUCATION FOR
COMMUNITY UNIT SCHOOL DISTRICT 187
CAHOKIA, ILLINOIS, ET AL.

No. 480.   Argued April 23, 1963.—Decided June 3, 1963.

*Raymond E. Harth* argued the cause for petitioners. With him on the brief were *John W. Rogers, Earl E. Strayhorn, Jack Greenberg, Constance Baker Motley* and *James M. Nabrit III.*

*Howard Boman* and *Robert H. Reiter* argued the cause and filed a brief for respondents.

*Alex Elson* filed a brief for the American Civil Liberties Union, as *amicus curiae,* urging reversal.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This suit, which invokes the jurisdiction of the District Court under the Civil Rights Act, is brought to vindicate the rights of plaintiffs who are Negro students in the Illinois public school system. The complaint alleges that Chenot School, St. Clair County, was built and its attendance area boundaries drawn in 1957 so as to make it exclusively a Negro school. It alleges that due to overcrowded conditions in an adjacent school, Centreville, which is in the same school district, all fifth and sixth grade classes in that school (containing 97% white students) were transferred to Chenot and kept segregated there. It alleges that enrollment at Chenot consists of 251 Negroes and 254 whites, all of the whites being in the group transferred from Centreville. It alleges that Negro students, with the exception of the eight transferred from Centreville, attend classes in one part of the school, separate and apart from the whites, and are compelled to use entrances and exits separate from the whites'. It alleges that Chenot school is a segregated

670

school in conflict with the Constitution of the United States; and it prays for equitable relief, including registration of plaintiffs in racially integrated schools pursuant to a plan approved by the District Court.

Respondents moved to dismiss the complaint on the ground, *inter alia*, that the plaintiffs had not exhausted the administrative remedies provided by Illinois law. The District Court granted the motion. 199 F. Supp 403. The Court of Appeals affirmed. 305 F. 2d 783. The case is here on a petition for a writ of certiorari which we granted. 371 U. S. 933.

The administrative remedy, which the lower courts held plaintiffs must first exhaust, is contained in the Illinois School Code. Ill. Rev. Stat. 1961, c. 122, § 22–19. By that Code, 50 residents of a school district or 10%, whichever is lesser, can file a complaint with the Superintendent of Public Instruction alleging that a pupil has been segregated in a school on account of race. The Superintendent, on notice to the school board, puts the complaint down for hearing within a prescribed time. After hearing, the Superintendent notifies the parties of his decision and, if he decides that the allegations in the complaint are "substantially correct," requests the Attorney General to bring suit to rectify the practice. Any final decision of the Superintendent may be reviewed by the courts. Moreover, under the School Code a school district may not file a claim for state aid unless it files with the Superintendent a sworn statement that the school district has complied with the constitutional and statutory provisions outlawing segregation in the public schools. See Ill. Const., Art. VIII, § 1; School Code §§ 10–22.5, 22–11, 22–12.

Respondents, while saying that Illinois law does not require the Superintendent to refuse to certify claims for state aid if he finds the particular school board practices segregation, contends that the Superintendent would have

the power to withhold his certificate and as a practical matter would do so.

We have previously indicated that relief under the Civil Rights Act may not be defeated because relief was not first sought under state law which provided a remedy. We stated in *Monroe v. Pape*, 365 U. S. 167, 183:

> "It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked."

The cause of action alleged here [1] is pleaded in terms of R. S. § 1979, 42 U. S. C. § 1983, which reads:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

That is the statute that was involved in *Monroe v. Pape, supra;* and we reviewed its history at length in that case. 365 U. S., at 171 *et seq.* The purposes were several-

---

[1] Federal jurisdiction is asserted under 28 U. S. C. § 1343, which in material part reads as follows:

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: ‸

. . . . .

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

fold—to override certain kinds of state laws, to provide a remedy where state law was inadequate, "to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice" (*id.*, 174), and to provide a remedy in the federal courts supplementary to any remedy any State might have. *Id.*, 180–183.

We would defeat those purposes if we held that assertion of a federal claim in a federal court must await an attempt to vindicate the same claim in a state court. The First Congress created federal courts as the chief—though not always the exclusive—tribunals for enforcement of federal rights. The heads of jurisdiction of the District Court, at the start limited,[2] are now numerous. In the beginning the main concern was the security of commercial intercourse, which "parochial prejudice" might endanger.[3]

> "Maritime commerce was then the jugular vein of the Thirteen States. The need for a body of law applicable throughout the nation was recognized by every shade of opinion in the Constitutional Convention. From this recognition it was an easy step to entrust the development of such law to a distinctive system of courts, administering the same doctrines, following the same procedure, and subject to the same nationalist influences." [4]

As the beneficiaries of the Fourteenth and Fifteenth Amendments became articulate and the nationalist needs multiplied, the heads of jurisdiction of the District Courts

---

[2] General "arising under" jurisdiction was not conferred on federal courts of first instance until passage of the Judiciary Act of 1875, 18 Stat. 470. See Hart and Wechsler, The Federal Courts and the Federal System, 727–733.

[3] Frankfurter and Landis, The Business of the Supreme Court (1928), pp. 8–9.

[4] *Id.*, p. 7.

increased, and that increase was a measure of the broadening federal domain in the area of individual rights.

Where strands of local law are woven into the case that is before the federal court, we have directed a District Court to refrain temporarily from exercising its jurisdiction until a suit could be brought in the state court. See *Railroad Comm'n* v. *Pullman Co.*, 312 U. S. 496; *Thompson* v. *Magnolia Co.*, 309 U. S. 478; *Harrison* v. *NAACP*, 360 U. S. 167. Thus we have stayed the hands of a Federal District Court when it sought to enjoin enforcement of a state administrative order enforcing state law, since any federal question could be reviewed when the case came here through the hierarchy of state courts. *Burford* v. *Sun Oil Co.*, 319 U. S. 315. The variations on the theme have been numerous.[5]

---

[5] See Note, 59 Col. L. Rev. 749. Yet where Congress creates a head of federal jurisdiction which entails a responsibility to adjudicate the claim on the basis of state law, *viz.*, diversity of citizenship, as was true in *Meredith* v. *Winter Haven*, 320 U. S. 228, we hold that difficulties and perplexities of state law are no reason for referral of the problem to the state court:

"We are pointed to no public policy or interest which would be served by withholding from petitioners the benefit of the jurisdiction which Congress has created with the purpose that it should be availed of and exercised subject only to such limitations as traditionally justify courts in declining to exercise the jurisdiction which they possess. To remit the parties to the state courts is to delay further the disposition of the litigation which has been pending for more than two years and which is now ready for decision. It is to penalize petitioners for resorting to a jurisdiction which they were entitled to invoke, in the absence of any special circumstances which would warrant a refusal to exercise it." *Id.*, p. 237.

And we held in *Kline* v. *Burke Construction Co.*, 260 U. S. 226, that, apart from contests over a *res* (*Pennsylvania* v. *Williams*, 294 U. S. 176), a suit *in personam* based on diversity of citizenship could continue in the federal court even though a suit on the same cause of action had been started in the state court:

"Each court is free to proceed in its own way and in its own time, without reference to the proceedings in the other court. Whenever

We have, however, in the present case no underlying issue of state law controlling this litigation. The right alleged is as plainly federal in origin and nature as those vindicated in *Brown* v. *Board of Education,* 347 U. S. 483. Nor is the federal right in any way entangled in a skein of state law that must be untangled before the federal case can proceed. For petitioners assert that respondents have been and are depriving them of rights protected by the Fourteenth Amendment. It is immaterial whether respondents' conduct is legal or illegal as a matter of state law. *Monroe* v. *Pape, supra,* at 171–187. Such claims are entitled to be adjudicated in the federal courts.[6] *Monroe* v. *Pape, supra,* at 183; *Gayle* v. *Browder,* 352 U. S. 903, affirming 142 F. Supp. 707; *Borders* v. *Rippy,* 247 F. 2d 268, 271. Cf., *e. g., Lane* v. *Wilson,* 307 U. S. 268; *Smith* v. *Allwright,* 321 U. S. 649; *Schnell* v. *Davis,* 336 U. S. 933, affirming 81 F. Supp. 872; *Turner* v. *Memphis,* 369 U. S. 350.

Moreover, it is by no means clear that Illinois law provides petitioners with an administrative remedy sufficiently adequate to preclude prior resort to a federal court

---

a judgment is rendered in one of the courts and pleaded in the other, the effect of that judgment is to be determined by the application of the principles of *res adjudicata* by the court in which the action is still pending in the orderly exercise of its jurisdiction, as it would determine any other question of fact or law arising in the progress of the case. The rule, therefore, has become generally established that where the action first brought is *in personam* and seeks only a personal judgment, another action for the same cause in another jurisdiction is not precluded." *Id.,* p. 230.

[6] As well stated by Judge Murrah in *Stapleton* v. *Mitchell,* 60 F. Supp. 51, 55, appeal dismissed pursuant to stipulation, 326 U. S. 690: "We yet like to believe that wherever the Federal courts sit, human rights under the Federal Constitution are always a proper subject for adjudication, and that we have not the right to decline the exercise of that jurisdiction simply because the rights asserted may be adjudicated in some other forum."

for protection of their federal rights. Under § 22–19 of the Illinois School Code petitioners could file a complaint alleging discrimination *if* they could obtain the subscription of the lesser of 50 residents or 10% of the school district. The Superintendent would then be required to hold a hearing on the matter. And,

> "If he so determines [that the allegations of the complaint are substantially correct], he shall *request* the Attorney General to apply to the appropriate circuit court for such injunctive or other relief as may be necessary to rectify the practice complained of." (Emphasis added.)

The Superintendent himself apparently has no power to order corrective action. In other words, his "only function . . . is to investigate, recommend and report. . . . [He] can give no remedy. . . . [He] can make no controlling finding of law or fact. . . . [His] recommendation need not be followed by any court . . . or executive officer." *United States Alkali Export Assn.* v. *United States,* 325 U. S. 196, 210. It would be anomalous to conclude that such a remedy forecloses suit in the federal courts when the most it could produce is a state court action that would have no such effect. See *Lane* v. *Wilson, supra,* at 274–275; *Monroe* v. *Pape, supra.*

Respondents urge, however, that prior resort to the Superintendent is necessary because by § 2–3.25 he can revoke recognition of a school district guilty of violating pupils' Fourteenth Amendment rights, and recognition is a necessary condition to state financial aid. Furthermore, state aid cannot be received by a district unless it submits a sworn statement that it does not discriminate between students "on account of color, creed, race or nationality." §§ 10–22.5, 18–12. Respondents say that the Superintendent would not certify a district for state aid if he determined that its sworn statement was false.

Apparently no Illinois cases have held that the Superintendent has authority to withhold funds once he has received an affidavit from the district, even if he determines that the affidavit is false. In any event, the withholding of state aid is at best only an indirect sanction of Fourteenth Amendment rights. When federal rights are subject to such tenuous protection, prior resort to a state proceeding is not necessary. See *Hillsborough* v. *Cromwell*, 326 U. S. 620, 625–626.

*Reversed.*

MR. JUSTICE HARLAN, dissenting.

In *Burford* v. *Sun Oil Co.*, 319 U. S. 315, 317–318, this Court said:

> "Although a federal equity court does have jurisdiction of a particular proceeding, it may, in its sound discretion, whether its jurisdiction is invoked on the ground of diversity of citizenship or otherwise, 'refuse to enforce or protect legal rights, the exercise of which may be prejudicial to the public interest'; [citing *United States* v. *Dern*, 289 U. S. 352, 360] for it 'is in the public interest that federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy.' . . . [Citing *Pennsylvania* v. *Williams*, 294 U. S. 176, 185.] Assuming that the federal district court had jurisdiction, should it, as a matter of sound equitable discretion, have declined to exercise that jurisdiction here?"

This wise approach has been followed by the lower federal courts in "school segregation" cases (see, *e.g.*, *Carson* v. *Board of Education*, 227 F. 2d 789; *Carson* v. *Warlick*, 238 F. 2d 724; *Covington* v. *Edwards*, 264 F. 2d 780; *Holt* v. *Raleigh City Board of Education*, 265 F. 2d 95; *Parham*

v. *Dove,* 271 F. 2d 132; *Shepard* v. *Board of Education,*
207 F. Supp. 341), and more than once this Court has
refused to interfere (see *Carson* v. *Warlick, supra,* cert.
denied, 353 U. S. 910; *Holt* v. *Raleigh City Board of Edu-
cation, supra,* cert. denied, 361 U. S. 818).[1]  For several
reasons I think the present case is peculiarly one where,
as was said in *Burford* (at p. 334), "a sound respect for
the independence of state action requires the federal
equity court to stay its hand."

1. It is apparent on the face of the complaint that this
case is quite atypical of others that have come before this
Court, in that the Chenot School's student body includes
both white and Negro students—in almost equal num-
bers—and in that none of the petitioners (or others whom
they purport to represent) has been refused enrollment in
the school.  The alleged discriminatory practices relate,
rather, to the manner in which this particular school dis-
trict was formed and to the way in which the internal
affairs of the school are administered.  These are matters
in which the federal courts should not initially become
embroiled.  Their exploration and correction, if need be,
are much better left to local authority in the first instance.

2. There is nothing that leaves room for serious doubt
as to the efficacy of the administrative remedy which Illi-
nois has provided.  (The text of the statute is set forth
in the Appendix to this opinion.)  The fact that the
Superintendent of Public Instruction himself possesses no
corrective power and that he can only "request" the Attor-

---

[1] Cases such as *Mannings* v. *Board of Public Instruction,* 277 F. 2d
370, and *Borders* v. *Rippy,* 247 F. 2d 268 (where the school boards had
taken no affirmative steps whatever to desegregate the schools), and
*Orleans Parish School Board* v. *Bush,* 242 F. 2d 156, and *Gibson* v.
*Board of Public Instruction,* 246 F. 2d 913 (arising in States having
school segregation statutes on their books), are wide of the mark in
the circumstances of this case.

ney General to enforce his findings by appropriate court proceedings does not, in my opinion, leave the administrative proceeding sanctionless (compare *United States Alkali Export Assn.* v. *United States,* 325 U. S. 196), or, as in *Lane* v. *Wilson,* 307 U. S. 268, serve to remove this case from the "exhaustion" requirements of *Burford.* If the Superintendent refuses to activate the Attorney General, his decision (as with a contrary one) is subject to judicial review. It is not suggested that the Attorney General could not also be compelled to act if he improperly refused to do so. And it must of course be assumed that these two responsible public officials will fully perform their sworn duty. Moreover, the terms of the statute itself which, among other things, provides for the use of compulsory process, strongly attest to the fact that the administrative remedy was intended as serious business and not as an exercise that might abort before fulfillment.

Nor can this administrative remedy otherwise be regarded as deficient. The fact that it takes a minimal number of school district residents to initiate a complaint before the Superintendent can hardly be deemed an untoward or unduly burdensome requirement. And the proceeding surely finds a strong practical even though "indirect sanction" (*ante,* p. 676) in the power of the Superintendent at least to make it more difficult for a school, guilty of racial discrimination, to obtain state financial aid—either by revoking "recognition" of the school district (*ante,* p. 675) or, as suggested to us by respondents' attorneys, by refusing to certify such a school for state aid.[2]

---

[2] Section 18–12 of the School Code of Illinois provides in part:

"No State aid claim may be filed for any district unless the clerk or secretary of the school board executes and files with the Superintendent of Public Instruction, on forms prescribed by him, a sworn

3. Finally, we should be slow to hold unavailing an administrative remedy afforded by a State which long before *Brown* v. *Board of Education,* 347 U. S. 483, had outlawed both by its constitution and statutes racial discrimination in its public schools,[3] and which since *Brown* has passed the further implementing legislation drawn in question in this litigation (Appendix).  For myself I am

statement that the district has complied with the requirements of Section 10–22.5 in regard to the non-segregation of pupils on account of color, creed, race or nationality."

[3] As early as 1901 the Supreme Court of Illinois in *People* v. *Mayor of Alton,* 193 Ill. 309, 312, 61 N. E. 1077, 1078, construing Art. VIII, § 1, of the Illinois Constitution, held:

"The complaint of the relator is that his children have been excluded, on account of their color, from the public school of said city located near his residence and been required to attend a school located a mile and a half distant from his residence, established exclusively for colored children.  Such complaint is not met by showing that the schools established for colored children in said city equal or surpass in educational facilities the schools established in said city for white children.  Under the law the. common council of said city had no right to establish different schools for the white children and colored children of said city and to exclude the colored children from the schools established for white children, even though the schools established for colored children furnished educational facilities . equal or superior to those of the schools established for white children."

Section 10–22.5 of the School Code of Illinois has provided since 1945 that:

". . . no pupil shall be excluded from or segregated in any such school on account of his color, race or nationality."

Sections 22–11 and 22–12 of the School Code, enacted in 1909, provide:

"Any school officer or other person who excludes or aids in excluding from the public schools, on account of color, any child who is entitled to the benefits of such school shall be fined not less than $5 nor more than $100."

"Whoever by threat, menace or intimidation prevents any colored child entitled to attend a public school in this State from attending such school shall be fined not exceeding $25."

unwilling to assume that these solemn constitutional and legislative pronouncements of Illinois mean anything less than what they say or that the rights assured by them and by the Fourteenth Amendment will not be fully and promptly vindicated by the State if petitioners can make good their grievances.

I would affirm.

## APPENDIX TO OPINION OF MR. JUSTICE HARLAN.

Section 22–19 of the School Code of Illinois provides:

Upon the filing of a complaint with the Superintendent of Public Instruction, executed in duplicate and subscribed with the names and addresses of at least 50 residents of a school district or 10%, whichever is lesser, alleging that any pupil has been excluded from or segregated in any school on account of his color, race, nationality, religion or religious affiliation, or that any employee of or applicant for employment or assignment with any such school district has been questioned concerning his color, race, nationality, religion or religious affiliation or subjected to discrimination by reason thereof, by or on behalf of the school board of such district, the Superintendent of Public Instruction shall promptly mail a copy of such complaint to the secretary or clerk of such school board.

The Superintendent of Public Instruction shall fix a date, not less than 20 nor more than 30 days from the date of the filing of such complaint, for a hearing upon the allegations therein. He may also fix a date for a hearing whenever he has reason to believe that such discrimination may exist in any school district. Reasonable notice of the time and place of such hearing shall be mailed to the secretary or clerk of the school board and to the first subscriber to such complaint.

The Superintendent of Public Instruction may designate an assistant to conduct such hearing and receive testimony concerning the situation complained of. The complainants may be represented at such hearing by one of their number or by counsel. Each party shall have the privilege of cross examining witnesses. The Superintendent of Public Instruction or the hearing officer appointed by him shall have the power to subpoena witnesses, compel their attendance, and require the production of evidence relating to any relevant matter under this Act. Any Circuit or Superior Court of this State, or any judge thereof, either in term time or vacation, upon the application of the Superintendent of Public Instruction or the hearing officer appointed by him, may, in its or his discretion, compel the attendance of witnesses, the production of books, papers, records or memoranda and the giving of testimony before the Superintendent of Public Instruction or the hearing officer appointed by him conducting an investigation or holding a hearing authorized by this Act, by an attachment for contempt, or otherwise, in the same manner as production of evidence may be compelled before said court. The Superintendent of Public Instruction or the hearing officer appointed by him may cause the depositions of witnesses within the State to be taken in the manner prescribed by law for like depositions in civil actions in courts of this State, and to that end compel the attendance of witnesses and the production of books, papers, records or memoranda. All testimony shall be taken under oath administered by the hearing officer, but the formal rules pertaining to evidence in judicial proceedings shall not apply. The Superintendent of Public Instruction shall provide a competent reporter to take notes of all testimony. Either party desiring a transcript of the hearing shall pay for the cost of such transcript. The hearing officer shall report a summary of the testimony to the Superintendent

of Public Instruction who shall determine whether the allegations of the complaint are substantially correct. The Superintendent of Public Instruction shall notify both parties of his decision. If he so determines, he shall request the Attorney General to apply to the appropriate circuit court for such injunctive or other relief as may be necessary to rectify the practice complained of.

The provisions of the "Administrative Review Act", approved May 8, 1945, and all amendments and modifications thereof and the rules adopted pursuant thereto shall apply to and govern all proceedings for the judicial review of any final decision rendered by the Superintendent of Public Instruction pursuant to this Section.