Patrick Allen BORROR, Petitioner,

v.

C. E. WHITE, Superintendent, Correctional Field Unit #1, Respondent.

Civ. A. No. 73–C–154–R.

United States District Court,
W. D. Virginia,
Roanoke Division.

June 6, 1974.

David M. Levy, Director, Charlottesville-Albemarle Legal Aid Society, Charlottesville, Va., for petitioner.

James W. Hopper, Asst. Atty. Gen., Richmond, Va., for respondent.

## OPINION and JUDGMENT

DALTON, District Judge.

██ Patrick Allen Borror, a state prisoner incarcerated at Correctional Field Unit #31, Tazewell, Virginia, filed a complaint in the United States District Court for the Eastern District of Virginia on November 12, 1973, which by order of that date was transferred to this court. In that complaint, Borror charges that he did not receive payment from the Commonwealth of Virginia for barbering services which he allegedly performed for inmates between November 1, 1972, and July 1, 1973, while incarcerated at Pulaski Correctional Field Unit #1. No jurisdictional basis is given for the complaint, and therefore the court will treat it as one having been filed pursuant to the provisions of 42 U.S.C. § 1983.

From petitioner's correspondence and the reply affidavits of respondent, it appears that Borror was paid a twenty cent bonus for each day that he worked in November of 1972, which sum was raised to twenty-five cents in December of 1972 and January of 1973, and that during these three months he worked on both the road crew and kitchen crew, which allowed him to work every day of the month. In February of 1973, Borror was taken off the kitchen crew, and he lost his "trusty" status, as a result of either his escape on February 10, 1973, as respondent contends, or as a result of an out-of-state detainer placed against him, as petitioner contends, and consequently was paid the twenty-five cent bonus only for those days that he worked on the road. During the time he was at Unit #1, he performed barbering services for unit employees, accepting money in return,[1] generally fifty cents for a haircut according to C. E. White, then Superintendent of the unit. Superintendent White says that petitioner also served as unit barber for the inmates from November of 1972 until his first escape[2] in February of 1973, and that his bonus pay of twenty-five cents reflects this. White maintains that petitioner lost his status as unit barber as a result of his increase in security status after his escape, and that any haircuts given after this were done on a voluntary basis, for which Borror was generally reimbursed with cigarettes by the inmates, according to Superintendent White. Petitioner, on the other hand, contends that even the twenty-five cent bonus that he received does not reflect any payment for his services as unit barber, and he says that he was never informed after his first escape that his status as unit barber had been terminated and that he continued to barber inmates, for which he says he is entitled to be paid by the Commonwealth of Virginia.

██ The above factual conflict between petitioner's allegations and the avowals of respondent notwithstanding,

1. *See* Borror v. White, No. 73–C–114–A (opinion by Judge Turk, W.D.Va. dated November 23, 1973), in which Borror (styled "Borrer") sought to have $28.85, which he had earned as a barber at Unit # 1, recredited to his personal account after it had been credited elsewhere following his February, 1973, escape.

2. Petitioner escaped again on *July 13, 1973*, resulting in his transfer to Unit # 31.

petitioner's claim cannot be remedied by this court. Borror's action is one for back "bonuses" allegedly owed him by the Commonwealth of Virginia. However, there exists no constitutional right on the part of a state prisoner to be paid for his labor. Sigler v. Lowrie, 404 F.2d 659, 661 (8th Cir. 1968). *See also* Sims v. Parke Davis & Co., 334 F.2d 774, 793 (E.D.Mich.1971). It is readily apparent that such "bonuses" as petitioner did receive were given by the grace of the Commonwealth of Virginia. If petitioner has any "right" to payment for his services as unit barber, it is derived from the laws of Virginia, and is not a right secured by the Constitution or laws of the United States within the meaning of 42 U.S.C. § 1983. The nonexistence of a federal right in the instant action does not foreclose the petitioner from seeking appropriate relief in a Virginia court, whose duty it is to interpret and enforce the laws of Virginia, the source of what Borror alleges is his right to compensation.

█ Additionally, as it is not pretended that such back bonuses as petitioner seeks would be paid out of any fund other than the treasury of Virginia, petitioner's action is barred by the Eleventh Amendment, as there is no indication that the Commonwealth has in any manner consented to this suit. Edelman v. Jordan, 415 U.S. 651, 94 S. Ct. 1347, 39 L.Ed.2d 662 (1974), reh. denied, 416 U.S. 1000, 94 S.Ct. 2414, 40 L. Ed.2d 777 (1974).

## NECESSITY OF EXHAUSTION

Because of respondent's insistence that this court should not yet entertain this case because petitioner Borror has not yet exhausted certain state administrative remedies available to him, the court appointed counsel to represent petitioner and asked both parties to submit memoranda on this issue. In his memorandum, respondent reveals that on September 10, 1973, the Virginia Division of Corrections established an inmate grievance procedure to provide inmates with an administrative method for the settlement of grievances which they have relating to the conditions of their imprisonment. This grievance procedure became effective on October 1, 1973.

The mechanics of the Virginia inmate grievance procedure,[3] in brief, are as follows: To begin a complaint, an inmate fills out and submits a grievance form to the assistant superintendent or other designated agent at his institution or field unit, who has five calendar days within which to respond to the inmate on the answer section of the form as to what action has been taken. All such decisions are reviewed by the superintendent of the unit, who has three calendar days in which to reach a determination. If his decision is contrary to the remedy the inmate seeks, the inmate is informed of his right to appeal. Appeals may be taken to a designated assistant director of the Division of Corrections, by those inmates in major institutions, and to a designated assistant superintendent of the Bureau of Correctional Units by those inmates in field units. These staff members have ten calendar days within which to reach a decision, and to notify the complaining inmate and unit superintendent of his determination. After receiving this disposition of his complaint, if the inmate still disagrees with the result, he may again note an appeal and a copy of this decision will be forwarded to the Director, Division of Corrections, or his designated agent, for review. The Director has five working days within which to reach a final decision, and to notify the inmate in writing of that decision. Hearings or investigations may be conducted at any stage of the grievance proceeding, but in no event is the total time from initial submission of the grievance until final action by the Director to exceed thirty days, according to the Division Guidelines.

3. Respondent has filed as his Exhibit IV a copy of Division Guideline No. 816, dated September 10, 1973, which outlines the grievance procedure.

Although petitioner did not utilize this newly-established procedure, he did write respondent White, who had become an Area Administrator, on October 1, 1973, concerning his alleged nonpayment for barbering services, and he also·wrote W. E. Woodroof, Superintendent of the Bureau of Correctional Field Units, on October 9 and 23, 1973. White responded to petitioner by a letter of October 10, 1973, stating that in his opinion Borror had been paid for the work he had done while at Unit #1.

Woodroof replied to Borror's first letter to him on October 15, 1973, advising petitioner that Mr. White was working on his complaints. It is respondent's contention that Borror has not exhausted his available state administrative remedies under the inmate grievance procedure as he has not appealed White's decision of October 10, 1973, to Mr. Woodroof, and then to Mr. J. F. Howard, then Director of the Division of Corrections—but instead sought recourse in this court. In support of this alleged exhaustion requirement, respondent cites McCann v. Moss, Civil Action No. 73–C–61–L (W.D.Va.October 26, 1973), an opinion by this court which very definitely does not require exhaustion—and giving it such construction, as the court has noted before, is making a mountain out of a molehill.

More aptly cited by respondent is McCray v. Burrell, 367 F.Supp. 1191, 14 Cr.L. 2184 (D.C.Md.October 16, 1973), appeal docketed, No. 74–1042 (4th Cir. January 9, 1974) (hereinafter, *McCray*). In *McCray*, Judge Northrop took judicial notice of the Inmate Grievance Commission established in 1971 by the State of Maryland, *see* 41 Md.Code Ann. § 204F(d)–(*l*) (Supp.1971), whose duties are·to investigate and correct grievances asserted by inmates of Maryland penal institutions, and held that inmates asserting claims under 42 U.S.C. § 1983 would henceforth have to exhaust this available, and as Judge Northrop found, adequate, state remedy before they could be heard in the district court on the § 1983 action.

As a practical matter, this court is entirely in sympathy and agreement with Judge Northrop's observations that the sheer bulk and number of prisoner suits under the guise of § 1983 is having a detrimental impact upon the administration of justice in the federal courts—as is reflected in the rising backlog of cases [4] and the consequent lengthening of time between filing and disposition of those cases. As Judge Northrop notes, an exhaustion requirement would aid in the weeding out of spurious claims, and would result in the compilation of an administrative record, which would be a great aid to the court as most § 1983 inmate complaints are filed with rather scanty substantiating details, and the state's records are often primitive at best.

As a matter of law, Judge Northrop concluded in *McCray* that while the Supreme Court has never required the exhaustion of either state administrative or court remedies by those asserting. § 1983 claims, in his opinion the Court had never specifically prohibited requiring administrative exhaustion when the possible remedy provided thereby proved to have adequate procedural safeguards and afforded the likelihood of resolution of the grievance. Judge Northrop did have to admit candidly, however, that the cases would not seem to encourage the· requirement of such exhaustion. The respondent in this case cites no new argument that had not previously been asserted by Judge Northrop, and as this issue of exhaustion of administrative remedies is now squarely before the Fourth Circuit Court of Appeals in *McCray*, this court sees no reason why it should reiterate at this time the discussion of the relevant cases capably analyzed in *McCray*.

---

4. Petitioner Borror, for example, has filed at least six § 1983 cases in this district recently, including Borrer v. Superintendent, No. 73–C–196–A (opinion by Judge Turk, W.D. Va., dated February 14, 1974), in which Borror complained, among other things, that he was not allowed to wear colored skivvies or to have lighter fluid while at Unit #31.

For now, if the language of the Supreme Court is unclear as to what the law in this area is, that of the Fourth Circuit is explicit: "Exhaustion of state remedies, administratively or through the state courts, is not a prerequisite to the exercise of federal jurisdiction under the Civil Rights Act of 1871." Hayes v. Secretary of Department of Public Safety, 455 F.2d 798, 800 (4th Cir. 1972). Until the Supreme Court or our Court of Appeals clearly changes this position, this court is bound by it.

Even if this court were to adopt the finding of law that was made in *McCray* that exhaustion may be required under § 1983 actions in a particular case, this court would not be inclined to go so far as to say that the Virginia inmate grievance procedure is a totally adequate one. While it is certainly a step in the right direction, and is one to be encouraged, the Virginia procedure possesses few of the characteristics of the legislatively-created Maryland procedure which proved to be effective enough to prompt Judge Northrop's findings—in comparison, the Virginia procedure is only at a stage somewhat further along than neolithic.

The administrative procedure which was found in *McCray* to be so adequate as to require exhaustion is set forth in 41 Md.Code Ann. § 204F(d)–(*l*) (Supp. 1971), but it is well summarized in the court's opinion. Therein, Judge Northrop analyzed the "due process adequacy" of the state remedy, "particularily from the standpoint of making sure the remedy [did] not contain the forbidden indicia of pre-judgment which renders exhaustion inappropriate." *McCray, supra.* The five member Inmate Grievance Commission in Maryland is comprised of persons experienced in penology, but not currently employed in any of the state's penal institutions. Inmates submit grievances directly to the Commission, whose Executive Director screens out clearly unmeritorious claims and tries informally to resolve some complaints by contacting the involved institution and requesting that it voluntarily abate the condition upon which the inmate based his grievance. If the complaint is not dismissed, withdrawn, or informally resolved, the Commission holds a hearing on it at one of its twice weekly meetings, which are held at the institution where the inmate is housed. Decisions are made by a majority of the Commissioners present (at least three must be sitting). A Voicewriter record is made of all hearings, and is transcribed when the inmate seeks judicial review. The Commission's decision is issued in the form of an order, setting forth findings of fact, the Commissioner's conclusions, and the disposition of the complaint. If the complaint is dismissed, judicial review may then be sought in the state circuit court; if found to be meritorious, the Secretary of Public Safety and Correctional Services, if in agreement, exercises his power over his correctional personnel to effect a remedy.

The Commission has the power to subpoena documents or witnesses at its hearings. The inmate-complainant has the right to appear in person before the Commission, can call witnesses on his behalf and cross-examine any other witnesses, and is allowed to be represented by an attorney of his own choosing at his own expense, by a law student, or by another inmate. The inmate may seek judicial review of the final order by the Commissioner or Secretary in the circuit court in whose jurisdiction he is incarcerated.

By comparison, as is conceded in respondent's memorandum, the Virginia procedure is "crude and in need of refinement." It provides few of the due process protections found by Judge Northrop to be crucial in the determination of the adequacy of a state remedy. There is no requirement for a hearing —though one may be held at the option of the state—and, therefore, there is no right on the part of the inmate to appear, to call witnesses, cross-examine, to lay the basis of a factual record for judicial review, or to have an attorney represent him—all of the normal trap-

pings that we have come to know as procedural due process. And most importantly, the investigations that are conducted under the Virginia procedure are conducted "in-house" exclusively by officials of the Division of Corrections, who, it would appear, do not constitute an impartial tribunal.

In the instant case, petitioner has already written respondent White, an Area Administrator, and W. E. Woodroof, Superintendent of the Bureau of Correctional Field Units, seeking redress for his complaint. The only higher administrator he could have appealed to under the Virginia procedure would have been to J. F. Howard, then Director of the Division of Corrections. In light of Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1967) (per curiam), requiring petitioner to take this step before his case can be considered by this court would certainly appear to be to require a "futile act." And, for whatever conclusion one may draw from the statement, the court did observe concerning a requirement that an inmate exhaust the essentially "in-house" Pennsylvania grievance system involved in *Houghton*, which provided no guarantee of a formal hearing with its attendant due process safeguards: "In any event, resort to these remedies is unnecessary in light of our decisions in Monroe v. Pape, 365 U.S. 167, 180–183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492; McNeese v. Board of Education, 373 U.S. 668, 671, 83 S.Ct. 1433, 1435, 10 L.Ed.2d 622; and Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647."

The time may well come when this court will wish to re-examine its position on the issue of inmate exhaustion of state administrative remedies. Until that time, in the absence of any legislative action on the part of the Virginia General Assembly,[5] it would appear to the court that the most effective measure that could be taken by the Virginia Division of Corrections would be to promote inmate usage of the existing grievance procedure, and to insure that it is administered speedily, impartially and fairly. Such a practice would surely reduce the number of state inmate petitions filed in the federal courts, while at the same time preserve the supplemental federal remedy provided by § 1983.

This court will not require that petitioner exhaust the administrative steps that he is entitled to pursue under Virginia's inmate grievance procedure before he is heard in a § 1983 action—although he is certainly encouraged to go that route initially with his complaint.

For reasons previously stated, the court must, upon the merits, grant respondent's motion for summary judgment, and the case is accordingly dismissed.

---

5. Attempts to have a legislatively-created procedure in Virginia failed during the 1974 session of the General Assembly. In contrast, North Carolina has become the second state to establish an Inmate Grievance Commission of some complexity and free from control by the actual administrators of the state prison system. N.Car.Gen.Stat. Ch. 148, Art. II (1974).