Shena MURPHY, Individually and as
Next Friend to Terry Carter, a
Minor, Plaintiff,

v.

FORT WORTH INDEPENDENT
SCHOOL DISTRICT, et al.,
Defendants.

No. 4:03–CV–0273–A.

United States District Court,
N.D. Texas,
Fort Worth Division.

April 24, 2003.

Bobbie Ross Edmonds, Law Office of
Bobbie Edmonds, Fort Worth, TX, for
plaintiff.

Joseph F. Cleveland, Jr., Brackett &
Ellis, Fort Worth, TX, for defendant.

## MEMORANDUM OPINION and ORDER

MCBRYDE, District Judge.

On April 22, 2003, came on for trial the
claims of Shena Murphy ("Murphy"), indi-
vidually, and as next friend of Terry Car-
ter (named as "John Doe" in the original
petition) ("Carter") (hereinafter collective-
ly "plaintiffs"), for procedural due process
under the United States Constitution.
Plaintiffs and defendants, Fort Worth In-
dependent School District ("FWISD") and
Superintendent Thomas Tocco ("Tocco"),
appeared by and through their attorneys
of record. Defendant Tocco also appeared
in person, as did Murphy and Carter. The
court, having heard and considered the
evidence presented and the arguments of
counsel, made certain findings of fact and
conclusions of law on the record. This

to relief, the court finds it unnecessary to    address other arguments raised by the parties.

memorandum opinion and order supplements those findings and conclusions.

## I.

### Jurisdiction

The court has jurisdiction of this action. Because federal constitutional claims are being asserted, plaintiffs need not first resort to the administrative process before proceeding in this court. *McNeese v. Board of Educ.*, 373 U.S. 668, 670–71, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963) (citing *Monroe v. Pape*, 365 U.S. 167, 183, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)); *Tex. Educ. Agency v. Cypress–Fairbanks Indep. Sch. Dist.*, 830 S.W.2d 88, 91 n. 3 (Tex.1992); *Janik v. Lamar Consol. Indep. Sch. Dist.*, 961 S.W.2d 322, 323 (Tex. App.—Houston [1st Dist.] 1997, writ denied).

## II.

### Issue

At issue is whether Carter was denied his right to due process in the proceedings that led to defendant Tocco's order that Carter not be allowed to return to his home campus of Paul Laurence Dunbar High School ("Dunbar") after serving a term of ten days in an alternative education placement ("AEP").

## III.

### Events Giving Rise to the Action [1]

Carter is a seventeen-year-old male honor student. Prior to January 30, 2003, Carter attended Dunbar, his "home school" within the Fort Worth Independent School District. He ranked number six in a graduating class of 186. The number one student in the class was Allison Robinson ("Robinson"). On January 30, 2003, Carter recited and performed for extra credit an original creative rap poem in his theater arts class before his teacher, Megan Merrill, ("Merrill") and his fellow classmates. Merrill's instructions for the contest were that students could "choose to bring a song, poem, story, etc. . . . (must be school appropriate . . . no cussing) and perform it for the class. . . ." Merrill did not review or edit Carter's poem before his presentation. After the presentation, Merrill removed Carter from her classroom and sent him to the Vice Principal, Keith Christmas, because Robinson, one of Carter's classmates, felt threatened by words in the poem. Carter was suspended for three days, from February 3 through February 5, 2003, for an alleged offense of "terroristic threat." On February 5, 2003, Murphy, Carter, and their counsel, Bobbie Edmonds, attended a conference before hearing officer Raul Perez ("Perez"). Merrill did not appear at the hearing.

---

**1.** The record establishes many troubling facts, *e.g.*, Carter's teacher, Merrill, was reprimanded as a result of the January 30 incident, but Carter was not apprised of that fact; none of the teachers who heard Robinson's complaints thought that she was in danger, a fact that they would have been required to report and would have reported if any complaint had substance; the students' statements, which generally exonerate Carter, were apparently ignored by defendants; the police report generated in connection with the January 30 incident reflects that Merrill was not aware of any other major confrontations or problems between Robinson and Carter, yet Tocco said that when he questioned Merrill, she decided that Carter would be a threat to Robinson's safety if he returned to Dunbar; no formal report or complaint of any kind was generated as a result of the "smack down" incident; after the "smack down" incident, Robinson told Carter to stay away from her and he did. However, the court is not in this action considering the merits of the decision to prohibit Carter from returning to Dunbar, but only the process used to arrive at that decision.

On February 7, 2003, Perez issued a decision requiring that Carter attend AEP for ninety school days before returning to Dunbar.[2] On that same day, Carter appealed the decision to defendant Tocco. On February 11, 2003, Dr. Carl Koch conducted an expedited risk assessment of Carter, and concluded that he posed a low risk of violence. After a review of the matter, Tocco concluded that, while inappropriate, Carter's poem was not a terroristic threat and that, therefore, Carter should only spend ten days in AEP. Accordingly, on February 12, 2003, Perez signed an amended decision, prepared at Tocco's instruction, ruling that Carter attend AEP for only ten days instead of ninety.[3] The amended decision contemplated that Carter would return to Dunbar at the end of the ten days. By letter dated February 13, 2003, Carter appealed the amended decision to the FWISD Board of Education ("Board"), complaining that (1) the amended decision recited that Carter had committed an assault, an offense not previously raised; (2) the decision needed to clarify the commencement date from which to count the ten-day period; and (3) he should not have been referred to AEP. On February 13, 2003, Carter enrolled at Metro Opportunity School ("Metro"). He successfully completed his AEP at Metro on February 28, 2003.

On February 13, 2003, having learned that Carter would only attend AEP for ten days, Robinson's parents contacted one of Tocco's assistants to complain. They suggested that there had been an escalating pattern of threats by Carter against their daughter.[4] Tocco had two extended conferences with Robinson and her parents, one with a lay representative appearing for the Robinsons. He investigated their allegations by making inquiries and obtaining statements from Carter's fellow classmates and teachers. Answer at 5, ¶ 6.2.j. And, he personally interviewed two teachers. Tocco said that one recalled Robinson complaining that Carter had threatened to slap her down and kick her.[5] According to Tocco, the other teacher, Merrill, answered "yes" to Tocco's question whether Carter would present an imminent threat to Robinson if he returned to Dunbar.[6] Neither Murphy, Carter, nor their counsel was given any notice of any of those activities. The meetings and other activities took place during the time that Carter's appeal was pending before Tocco; and, Tocco was well aware that Carter was represented by counsel. Tocco explained that there was no need to discuss his investigation with Carter, because he, Tocco, had "the only evidence [he] needed." Apr. 14 tr. at 14. Tocco's consideration of the additional evidence was in violation of district policy that he would "review only the written documents and the tape recording of the [February 5] conference," Ex. notebook, tab 15 at 11, and that he "[would] not consider any evidence or testimony that

---

**2.** Perez testified that the decision was made by a panel of five hearing officers and their supervisor.

**3.** The February 12 letter says that the "committee" amended the duration of the AEP.

**4.** The evidence discloses that there was competition between Carter and Robinson over class standing. Robinson is slated to be valedictorian.

**5.** This event occurred when Carter took verbal issue with Robinson and other students as

they were harassing a substitute teacher in a class attended by both Carter and Robinson. The substitute teacher testified that she will be forever grateful to Carter for his intervention.

**6.** This teacher taught the class where Carter performed the rap poem. Her testimony at trial suggests that she thought Carter possibly could be a threat to Robinson, not that he actually was.

was not presented at the original conference." *Id.*

As a result of having met with Robinson's parents and having considered the additional evidence obtained without notice to Carter, Tocco determined to change the February 12 ruling by denying Carter the right to return to Dunbar at the end of the ten-day AEP. But for the insistence of Robinson's parents, Tocco would never have issued the order to transfer Carter to another high school to complete his senior year. Neither Carter, nor anyone on his behalf, had any notice that such a transfer was under consideration.

By letter dated February 20, 2003, Tocco issued his decision on Carter's appeal, stating that he was upholding the recommendation to place Carter in AEP for ten days, but changing the February 12 ruling to Carter's detriment by adding that Carter would not be allowed to return to Dunbar. By letter dated February 24, 2003, Carter appealed Tocco's decision to the Board. One month later, on March 25, 2003, the Board heard the appeal. Throughout that thirty-day period—indeed, from January 31, 2003, to the date of trial—Carter was denied attendance at Dunbar.

Before the March 25 hearing, plaintiff was cautioned that the Board would only consider evidence that had been "presented at the level below" and that it would "not take additional testimony." Ex. notebook, tab 5, "PROCEDURES FOR INDIVIDUAL (NON–EMPLOYEE) COMPLAINT APPEALS." Although Carter could raise any issue he wanted, the Board "[would] not consider any issues not presented and preserved at the prior level." *Id.* Part of the record on appeal included the information gathered *ex parte* by Tocco as a result of his meetings with the Robinsons. That was material that plaintiffs had never had an opportunity to attack, since it was not disclosed to their attorney until three days before the Board hearing. No issue had been preserved "below," because there was no "below" except the *ex parte* proceedings. Even if there had been a "prior level" at which issues would have been preserved, plaintiffs were limited to a fifteen-minute "argument" before the Board. *Id.* At the conclusion of the proceedings, at 11:22 p.m., the Board, voting 5–3, upheld Tocco's decision not to allow Carter to return to Dunbar. Although Carter has requested reconsideration of that decision, no hearing on the request has yet been set; and, the school district has said that the earliest it would consider the matter would be the fourth week of May, at the very end of school year, only days before graduation.

Now recognizing, as Tocco did, that it would be wrong to increase Carter's punishment after having reduced it to ten days' AEP,[7] defendants set upon a subterfuge of pretending that Carter's transfer was a wholly separate matter. For example, Bertha Whatley, the General Counsel for FWISD, testified at trial that two matters were presented to the Board on March 25, although by that time the issue of the AEP assignment was wholly moot and, in any event, non-appealable. Further, defendants' counsel referenced on several occasions § 25.034 of the Texas Education Code as giving the authority for the transfer. That statute, however, does not authorize a transfer at the request of parents other than those of the student to be transferred. (Again, Tocco made plain that that was the sole reason for the transfer.)

---

7. Tocco testified that had it not been for his concern about subjecting Carter to double jeopardy, his inclination would have been to increase Carter's punishment by raising the ten-day AEP to a thirty-day AEP.

## IV.

### Due Process Was Violated

■ Certain procedural rights of students are clearly set forth in the student conduct code provided by FWISD. A student has the right to have his punishment determined based solely on the facts developed at the initial conference before the hearing officer. On appeal, no new information can be taken or considered. This is in keeping with a fundamental tenet of due process that a person may exercise his right of appeal without fear of increased potential punishment if he does so. *Deloney v. Estelle*, 713 F.2d 1080, 1083 (5th Cir.1983). Here, Carter appealed his ten-day AEP assignment and the appellate judge, Tocco, increased his punishment by, in effect, giving him the death penalty by refusing to allow him to return to his home school. According to Tocco's February 20, 2003, letter, that penalty was meted "[i]n response to the appeal." And, the penalty was based on information obtained without any notice to Carter and without giving him any chance to respond.

■ Defendants make light of the seriousness of their actions by falling back on the argument that Carter had no constitutional right to attend any particular school,[8] so they could reassign him at will with no prior notice, since he had an opportunity to have a post-transfer hearing. As the record establishes, this was not a routine reassignment, but rather one made at the insistence of the parents of another student. Section 25.033 of the Texas Education Code, upon which defendants rely, clearly refers only to "*the* parents" of "*the* student" in discussing the right to a transfer of "the student" unless "there is a reasonable basis for denying the request."[9] TEX. EDUC. CODE ANN. §§ 25.033 & 25.034(e) (Vernon 1996). Moreover, the hearing provided after the transfer had occurred was meaningless, since the Board could consider the *ex parte* evidence gathered against Carter, but he had no chance to present his own evidence to show how excessive a punishment his banishment from Dunbar would be. His expulsion from that school had immediate consequences, and his "right" to redress afforded him too little, and was much too late, in any event.

No matter the label put on the reassignment, Carter's transfer was no different in principle from an expulsion, which affords the student a right to prior notice and a hearing "at which the student is afforded appropriate due process as required by the federal constitution." TEX. EDUC. CODE § 37.009(f) (Vernon Supp.2003).

Without regard to the Texas statute, Carter was denied procedural due process. He was not told what he was accused of doing and what the basis of the accusation was. *See Goss v. Lopez*, 419 U.S. 565, 582, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Nor did he have an opportunity to tell his side of the story in order to make sure that an injustice was not done.[10] *Id.* at 580, 95

---

8. *Nevares v. San Marcos Consolidated Independent School District*, the case upon which defendants rely most heavily, is distinguishable. 111 F.3d 25 (5th Cir.1997). There, no issue of procedural due process was raised. Instead, the plaintiff sought court interference before the procedures provided by Texas law had been utilized. Here, Texas law and FWISD policy provide procedures implementing a student's rights to due process under the United States Constitution that were wholly ignored by defendants.

9. In other words, the Education Code does not authorize—much less mandate, as defendants urge—the transfer of a student upon the request of another student's parents. And, in any event, Texas statutes do not fix whether a right to due process exists under the U.S. Constitution.

10. Even if this were the type of situation where due process might be satisfied by the opportunity for a post-transfer hearing, the record establishes that such opportunity in this case was worthless.

S.Ct. 729. His right, fixed by district policy, to attend his home school was taken from him by a process that was unfair by any reasonable standard. By no means was the denial of Carter's right to attend his home school a *de minimis* or trivial deprivation. *See Hassan v. Lubbock Indep. Sch. Dist.,* 55 F.3d 1075, 1081 (5th Cir.1995). FWISD policy gave Carter the right to attend his home school, Dunbar. Defendants arbitrarily took away that right by their actions. It goes without saying that the stigma attached to being transferred in the last months of his senior year impugned Carter's good name, reputation, honor, and integrity and had the potential to seriously damage Carter's standing with his fellow pupils and teachers as well as to interfere with later opportunities for higher education and employment. *Goss,* 419 U.S. at 574–75, 95 S.Ct. 729.

"The fundamental requisite of due process of law is the opportunity to be heard, a right that has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to ... contest." *Goss,* 419 U.S. at 579, 95 S.Ct. 729 (internal quotations and citations omitted). As the Fifth Circuit has noted, standards of procedural due process are not "wooden absolutes." *Keough v. Tate County Bd. of Educ.,* 748 F.2d 1077, 1081 (5th Cir.1984). "The sufficiency of procedures employed in any particular situation must be judged in the light of the parties, the subject matter and the circumstances involved." *Id.* (quoting *Ferguson v. Thomas,* 430 F.2d 852, 856 (5th Cir. 1970)). In this case, basic fairness and integrity, *see id.,* required that Carter be given notice that his status as a student at Dunbar was in jeopardy.[11]

11. No evidence was adduced at trial of any exigent circumstances making transfer without notice a necessity. Instead, Carter had heeded Robinson's earlier request that he stay

V.

## *Plaintiffs Are Entitled to Injunctive Relief*

Plaintiffs seek in their pleadings preliminary and permanent injunctive relief that would have the effect of requiring defendants to allow Carter to resume his education at his home school, Dunbar, and to participate in school and extracurricular activities sponsored by Dunbar. The trial of this action on the merits was consolidated with the hearing on plaintiffs' application for preliminary injunction. After having heard and considered the trial evidence, the court has concluded that nothing would be gained by going through the preliminary injunction step inasmuch as the evidence establishes that plaintiffs should prevail on the merits of their due process claim.

■ The prerequisites generally applicable for the grant of a preliminary injunction were enumerated by the Fifth Circuit in *Canal Authority of State of Florida v. Callaway:*

> The four prerequisites are as follows: (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest.

489 F.2d 567, 572 (5th Cir.1974). Generally speaking, the standard for a permanent injunction is the same as the standard for a preliminary injunction except that, in the case of the former, the plaintiff must actu-

away from her. And, there is no evidence of any physical altercation between her and Carter.

ally succeed on the merits rather than to merely show, as in the case of the latter, a likelihood of success. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).

■ The court has concluded that for equity to be served in this action, the court should grant a permanent injunction basically of the kind sought by plaintiffs. The record of the trial makes abundantly clear, and the court finds, that Carter will suffer irreparable injury if such an injunction is not granted. He would be denied, without having had his procedural due process rights recognized, the valuable right to continue his education at his home school. No form of compensation is available to Carter for the injury he would suffer if he were not to be returned in his home school for the continuation of his education.

The threatened injury to Carter far outweighs any threatened harm such an injunction may do to defendants. Rather, such an injunction could have a salutary effect on defendants by providing a reminder to them that they must honor the procedural due process rights of the students in the FWISD by conducting disciplinary proceedings, or any proceeding where any valuable right of the student has the potential to be adversely affected, with the level of fairness appropriate to the threatened interests of the affected student. The injunction would not interfere with the ability of defendants to make appropriate provision for the safety of the students of the FWISD. Nothing was presented at trial that has persuaded the court that the defendants do not have the capacity to provide appropriate protection to the physical, mental, and emotional interests of both students concerned if both of them are in attendance for educational purposes at Dunbar. They were classmates at Dunbar for approximately two years without there being any interaction between the two of them that was signifi-

cant enough to be called to the attention of any of the school administrators prior to the performance by Carter on January 30, 2003, of his rap poem in the drama class.

Nor would the grant of such an injunction disserve the public interest. To the contrary, the interest of the public will be served by a message to defendants' that they should recognize and protect the procedural due process rights of their students.

Therefore, the court is granting injunctive relief to the extent provided below.

## VI.

### *Plaintiffs' Request for Recovery of Attorney's Fees*

While plaintiffs have not expressly relied on 42 U.S.C. § 1983 as a basis for the assertion in this action of their claims under the United States Constitution, the court considers that § 1983 is the statutory basis for those claims. Therefore, there is the potential that plaintiffs will have the right to recover under the authority of 42 U.S.C. § 1988 a reasonable attorney's fee as part of the costs. Plaintiffs urge in their initial pleading that they be given judgment for reasonable attorney's fees. The court is making no ruling on the issue of attorney's fees at this time, but assumes that plaintiffs will make a formal, timely motion for attorney's fees under the authority of Rule 54(d)(2) of the Federal Rules of Civil Procedure if they wish to pursue that matter further.

## VII.

### *ORDER*

For the reasons given on the record at the trial conducted April 22, 2003, and stated in the foregoing parts of this memorandum opinion and order,

The court ORDERS and DECLARES that the decision of defendants to require Carter to transfer from his home school, Dunbar, to another high school was made in violation of procedural due process rights given to Carter by the Fourteenth Amendment to the Constitution of the United States, with the result that the requirement of defendants that there be such a transfer is nugatory and of no force or effect.

The court further ORDERS, and ENJOINS, defendants to allow Carter to return to Dunbar for the continuation of his education and permit Carter to participate in Dunbar-sponsored activities, including extracurricular activities.

### FINAL JUDGMENT

Consistent with the reasons given on the record at the trial conducted April 22, 2003, in the above-captioned action and those stated in the court's memorandum opinion and order of even date herewith,

The court ORDERS, ADJUDGES, DECREES, and DECLARES that the decision of defendants, Fort Worth Independent School District and Superintendent Thomas Tocco, to require plaintiff, Terry Carter, ("Carter") to transfer from his home school, Paul Laurence Dunbar High School, ("Dunbar") to another high school was made in violation of procedural due process rights given to Carter by the Fourteenth Amendment to the Constitution of the United States, with the result that the requirement of defendants that there be such a transfer is nugatory and of no force or effect.

The court further ORDERS, ADJUDGES, DECREES, and ENJOINS, defendants to allow Carter to return to Dunbar for the continuation of his education and permit Carter to participate in Dunbar-sponsored activities, including extracurricular activities.

The court further ORDERS and ADJUDGES that plaintiffs have and recover from defendants, jointly and severally, costs of court incurred by plaintiffs, exclusive of attorney's fees, and that the issue of recoverability of attorney's fees as costs will be determined later if an appropriate motion is timely filed by plaintiffs.