453 F.2d 238
 Riley REID, a minor under the age of 21 years, by his
mother, Ellen Hoffman, and Benjamin Kennedy, a minor under
the age of 21 years, by his mother, Virginia Kennedy, on
behalf of themselves and all others similarly situated,
Plaintiffs-Appellants,
v.
The BOARD OF EDUCATION OF the CITY OF NEW YORK, and Harvey
B. Scribner, individually and as Chancellor of the
Board of Education, Defendants-Appellees.
 No. 253, Docket 71-1791.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 9, 1971.
Decided Dec. 14, 1971.
 
 Lawrence J. Fox, New York City (Community Action for Legal Services, Inc., New York City, Marttie Louis Thompson, David Rudenstine, New York City, of counsel), for plaintiffs-appellants.
 Mary P. Bass, New York City (J. Lee Rankin, Corp. Counsel, Stanley Buchsbaum, New York City, of counsel), for defendants-appellees.
 Before KAUFMAN and MANSFIELD, Circuit Judges, and LEVET, District Judge.*
 IRVING R. KAUFMAN, Circuit Judge:
 
 
 1
 This dispute centers around the special public school classes provided by the Board of Education of the City of New York for brain-injured and other handicapped children. Ellen Hoffman and Virginia Kennedy appeal on behalf of their respective sons, Riley Reid and Benjamin Kennedy, two unfortunate ten-year-old brain-injured children, from an order of Judge Metzner dismissing their complaint.
 
 
 2
 The complaint alleged that the Board and Harvey Scribner, as Chancellor of the New York school system, deprived Riley Reid and Benjamin Kennedy of due process of law, the equal protection of the law and the right to a free public education, all in contravention of the fourteenth amendment, by failing to screen applicants for these classes within a reasonable time and by failing to provide special classes for all eligible children.[1]
 
 
 3
 Although the complaint is sparse, the allegations reveal the urgency of appellants' grievances. We are informed that Riley Reid, who has been diagnosed as minimally brain injured by the Child Psychiatric Evaluation Research Unit of the New York State Department of Mental Health, applied for placement in a special class on September 1, 1970. As of February, 1971, Riley had passed the first part of the screening process, but had not yet received a diagnostic evaluation, which comprises the second part.[2] Riley's mother allegedly was told that it would be approximately one year from time of screening (assuming Riley is found eligible) until placement. To the best of our knowledge, Riley's application still has not been fully processed. Thus, at a minimum, Riley will have waited at least 28 months from time of application until placement. During the intervening period, Riley withdrew from regular public school under a medical discharge because he was receiving no benefit and, it was alleged, being "severely injured." He now receives no formal education other than a few hours each week of home instruction,[3] and is falling further behind his peers, while his handicap becomes progressively more difficult to treat.
 
 
 4
 Benjamin Kennedy was placed on the waiting list in March, 1970. Although found eligible in January of this year, he has yet to be placed in a special class. His mother allegedly has been advised that he may have to wait as long as two years. Benjamin, at the date of the complaint, was attending regular public school.
 
 
 5
 Appellants brought this action under 42 U.S.C. Sec. 1983, asserting jurisdiction under 28 U.S.C. Secs. 1343(3) and (4), on behalf of all brain-injured children eligible for the New York City special classes. According to the complaint, there are more than 400 children who, like Riley Reid, have applied for admission but have not been screened, and more than 200 children who have been declared eligible but have not been placed. "If all the children on the waiting list were screened promptly," the complaint tells us, "the inadequacy of the number of classrooms would be even more pronounced."
 
 
 6
 Appellants sought a preliminary and permanent injunction enjoining defendants "to provide special public school classes with adequate staff and resources for all eligible brain-injured children and to provide proper screening within a reasonable time for plaintiffs and all others similarly situated," as well as a declaratory judgment that defendants had violated the 14th amendment and the constitutional right to a free public education. On June 22, 1971, acting upon appellants' motion for a preliminary injunction and appellees' cross-motion for dismissal under Rule 12(b) (1) or (6), Judge Metzner dismissed the complaint, holding that the facts of the case called for exercising the doctrine of abstention. Although we agree that it was proper for the district court to stay its hand,[4] Judge Metzner should have retained jurisdiction pending the determination of appellants' state law claims in the New York courts.
 
 I.
 
 7
 Although appellants did not append state law claims to their complaint, it appears clearly that they have both a substantial statutory and constitutional claim under New York law. Section 4404, subd. 2 of the New York Education Law (McKinney's Consol.Laws, c. 16, 1970) requires "[t]he board of education of each city . . . to furnish suitable education facilities for handicapped children by means of home-teaching, transportation to school or by special class. . . . Where there are ten or more handicapped children who can be grouped homogeneously in the same classroom for instructional purposes such board shall establish such special classes as may be necessary to provide instruction adapted to the mental attainments and physical conditions of such children."[5] Under section 4401, a "handicapped child" is defined as "one who, because of mental, physical or emotional reasons, cannot be educated in regular classes but can benefit by special services and programs. . . ." We cannot say at this juncture of the case that the New York City Board of Education is not in default of its statutory obligations by not providing prompt screening and placement for all eligible brain-injured children. Moreover, Riley and Benjamin and the members of the class they represent may have been deprived of their rights under Article XI, section I of the New York Constitution:
 
 
 8
 The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated.
 
 
 9
 Under these circumstances, where a decision under state law might obviate the necessity of a federal constitutional determination, but the state law is unclear and a federal adjudication under the court's pendent jurisdiction would thrust the federal courts into a sensitive area of state administration, the federal courts should abstain.
 
 
 10
 Almost 150 years ago Chief Justice Marshall wrote:
 
 
 11
 It is most true, that this court will not take jurisdiction if it should not; but it is equally true, that it must take jurisdiction, if it should. The judiciary cannot, as the legislature may, avoid a measure, because it approaches the confines of the constitution. . . . We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the Constitution.
 
 
 12
 Cohens v. Virginia, 6 Wheat. 264, 404, 5 L.Ed. 257 (1821). But this precept, unlike other landmark decisions of the Chief Justice concerning federal jurisdiction, has not withstood the demands of federalism and the complexities of constitutional adjudication.
 
 
 13
 In Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), Justice Frankfurter, writing for a unanimous Court, fashioned the beginnings of the modern doctrine of abstention. The Texas Railroad Commission had ordered that "no sleeping car shall be operated on any line of railroad in the State of Texas . . . unless such cars are continuously in the charge of an employee . . . having the rank and position of Pullman conductor." Previously, many sleeping cars had been in the charge of Pullman porters-all blacks. The conductors, on the other hand, were all whites. A three-judge federal district court enjoined enforcement of the Commission order as violative of the equal protection clause, but the Supreme Court reversed, directing the district court "to retain the bill pending a determination of proceedings, to be brought with reasonable promptness, in the state court . . .." 312 U.S. at 501-502, 61 S.Ct. at 646. The decision turned upon the claim that the Commission regulation exceeded the authority conferred on the Commission by Texas statute. The import of the Texas statute was far from clear, however, and the Court accordingly declined to reach the merits of either the state law claim or the constitutional claims:[6]
 
 
 14
 . . . the last word on the statutory authority of the Railroad Commission in this case, belongs neither to us nor to the district court but to the supreme court of Texas. In this situation a federal court of equity is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication. . . . The resources of equity are equal to an adjustment that will avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication. . . . Few public interests have a higher claim upon the discretion of the federal chancellor than the avoidance of needless friction with state policies. . . .
 
 
 15
 312 U.S. at 500, 61 S.Ct. at 645.
 
 
 16
 During the 1950's and 1960's the doctrine of abstention seemingly was confined within narrow limits. The most important of the "special circumstances" found to justify abstention was the "susceptibility of a state statute of a construction by the state courts that would avoid or modify the constitutional question," Zwickler v. Koota, 389 U.S. 241, 248-249, 88 S.Ct. 391, 396, 19 L.Ed.2d 444 (1967), or as Justice Harlan put it, "cases in which the federal constitutional issue might be mooted or 'presented in a different posture' by a state court determination of pertinent state law." Id. at 256, 88 S.Ct. at 400. See also Harman v. Forssenius, 380 U.S. 528, 534-537, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965); Harrison v. NAACP, 360 U.S. 167, 177, 79 S.Ct. 1025, 1030, 3 L.Ed.2d 1152 (1959) ("This principle does not, of course, involve the abdication of federal jurisdiction, but only the postponement of its exercise," Harlan, J.). Each of these cases involved federal constitutional claims which were inextricably intertwined with the operation of the challenged state statutes.
 
 
 17
 Moreover, the Court during the 1960's showed a marked trend back to the teaching of Chief Justice Marshall. The Court twice has cited with approval the statement of Judge Murrah in Stapleton v. Mitchell, 60 F.Supp. 51, 55 (D.Kan.), appeal dismissed per stipulation, Mitchell v. McElroy, 326 U.S. 690, 66 S.Ct. 172, 90 L.Ed. 406 (1945):
 
 
 18
 We yet like to believe that wherever the Federal courts sit, human rights under the Federal Constitution are always a proper subject for adjudication, and that we have not the right to decline the exercise of that jurisdiction simply because the rights asserted may be adjudicated in some other forum.
 
 
 19
 Zwickler v. Koota, 389 U.S. at 248, 88 S.Ct. at 395; McNeese v. Board of Education, 373 U.S. 668, 674 n. 6, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963).
 
 
 20
 But, the last two Terms of the Court have witnessed the rejuvenation of the full implications of the Pullman doctrine. In Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970), the Court reversed a three-judge district court which had enjoined the enforcement of an Alaskan statute and regulations governing the issuance of licenses for commercial fishing as violative of the fourteenth amendment. The Court ordered the district court to abstain pending a state court decision under Article VIII of the Alaskan constitution, an uninterpreted provision which established fishing rights in Alaskan natural waters. A state court decision, Justice Douglas reasoned for a unanimous court, not only could avoid a decision under the fourteenth amendment, but also "would avoid any possible irritant in the federal-state relationship." These are the same concerns Justice Frankfurter expressed nearly thirty years earlier in Pullman.
 
 
 21
 Early views that Reetz was confined to areas of state administration relating only to property rights rather than personal rights were dispelled by Askew v. Hargrave, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971). Specifically reaffirming Reetz (now referred to as a "line of decision"), the Court held that a three-judge district court should have abstained from deciding whether the Florida Millage Rollback Law violated the equal protection clause until state law claims under the Florida constitution were resolved in the state courts. The facts and decision are particularly relevant to the case before us because the respondents claimed that the Florida statute resulted in discriminatory provision of public education-the ad valorem school tax allegedly yielded less dollars per child for education in property-poor counties than property-rich counties.
 
 
 22
 The principles enunciated long ago in Pullman and after a gap in time reaffirmed in Reetz and Askew control the case before us. See also City of Meridian v. Southern Bell Telephone & Telegraph Co., 358 U.S. 639, 79 S.Ct. 455, 3 L.Ed.2d 562 (1959); Coleman v. Ginsberg, 428 F.2d 767 (2d Cir. 1970). Appellants here have an available state statutory claim, as in Pullman, and a state constitutional claim, as in Reetz and Askew-a favorable decision under either claim would make it wholly unnecessary to consider the very substantial and difficult questions raised under the 14th amendment.[7] We are instructed, however, that the existence of state claims will not itself justify abstention. The state law, in addition, must be unclear. See, e. g., Zwickler v. Koota, 839 U.S. at 251, 88 S.Ct. 391. Certainly, neither the statute nor the constitutional provision under attack here includes guidelines as to reasonable compliance either with regard to the time for screening and placement of applicants or to the substance of programs offered. Although there are extensive regulations pursuant to the statute, see 8 N.Y.C.R.R. Sec. 200, none provide sufficient standards for evaluating the procedures of the New York City Board of Education.[8] And we are not aware of any state court decision defining the obligations of the Board under section 4404 or Article XI of the New York constitution so that a federal court would be aided in disposing of the state claims under pendent jurisdiction. This is precisely the situation Justice Frankfurter warned against in Pullman: a "tentative decision" by the district court on the State law claims which might be replaced by an authoritative state adjudication.[9] 312 U.S. at 500, 61 S.Ct. 643.
 
 
 23
 Moreover, we are presented here with a particularly sensitive and complex area of state regulation. In 1957 New York enacted Article 89 of its current Education Law. Section 4404 is only one section within a broad scheme of education for handicapped children, including home instruction and tuition grants, fostered by special provisions for state aid. In its brief the Board of Education informs us that special classes increased from only 8 in 1959 to 184 (schooling 1089 children) in 1970. Lest anyone conclude that application, determination of eligibility and placement in these classes could be pro forma, we are constrained to point out that each borough of the City has a nine-member screening panel consisting of a supervisor of special classes, two teachers of brain-injured children, a speech teacher, a psychologist, a psychiatrist, a medical director, a pediatric neurologist and a medical social worker. Obviously the special classes must be staffed with specially trained teachers and equipment adapted to the needs of the children.
 
 
 24
 The scant evidence available tends to indicate that the New York courts are not reluctant to review complaints under the New York statutory scheme. In 1958, the Appellate Division, in holding that section 4404 does not apply to children that cannot benefit from any education, stated:
 
 
 25
 While, up to the present time, there may not have been full compliance by the Board of Education [of New York City] with the statutory scheme, the record does indicate that a start has been made in that direction. On the argument of the appeal, moreover, counsel assured the court that the Board was continuing its efforts looking to the establishment of special classes for mentally retarded children in the specified age group, if at all feasible. While recognizing the manifold difficulties with which it is confronted, we assume, nevertheless, that the Board of Education will continue its efforts to comply with the statute with all due diligence under the circumstances, subject, of course, to the Board's discretionary powers thereunder. This determination is made, without prejudice to a new application, if it should later appear that the respondents have failed to fulfill the legislative provision with all reasonable speed.
 
 
 26
 Elgin v. Silver, 9 A.D.2d 645-646, 192 N.Y.S.2d 475, resettled, 9 A.D.2d 874, 199 N.Y.S.2d 379 (1959). Although there is evidence indeed that the Board of Education in the intervening 13 years has seriously attempted-albeit unsuccessfully-to comply with the legislature's mandate, it also appears that neither appellants nor other parents of brain-injured children until recently have sought the aid of the New York courts.[10]
 
 
 27
 In holding that appellants must resort to the New York courts for initial resolution of available state claims, we have fully considered Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 and McNeese v. Board of Education, supra, which held that Sec. 1983 provides a supplementary remedy and that "assertion of a federal claim in a federal court [need not] await an attempt to vindicate the same claim in a state court." 373 U.S. at 672, 83 S.Ct. at 1436. But, the state law claims of appellants here are separate and distinct from the rights asserted as a basis for their federal claims. This is not a case where the state claims, although not based upon a state remedy for a federally-provided right, are grounded upon state constitutional rights which are merely counterparts for the federal rights asserted. See Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971).
 
 
 28
 Finally, we must join those who have instructed that "It is better practice, in a case raising a federal constitutional or statutory claim, to retain jurisdiction, rather than to dismiss. . . ." Zwickler v. Koota, 389 U.S. at 244 n. 4, 88 S.Ct. at 393; see Pullman, supra; Coleman v. Ginsberg, supra; C. Wright, Law of Federal Courts Sec. 52, at 198 (2d ed. 1970). This is particularly true where the state law claims are wholly separate and distinct from the federal constitutional claims, and appellants may want to preserve their federal claims, which assert violations of important personal and human rights, for presentation to the federal courts. See generally England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 421-422, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).
 
 
 29
 The judgment of the District Court is vacated and the case is remanded for further proceedings consistent with this opinion.
 
 
 
 *
 Of the Southern District of New York, sitting by designation
 
 
 [1]
 The complaint alleged that the defendants discriminated between brain-injured children who had been placed in special classes and those who had been not; as well as between those who had not been placed and normal children who are provided a free public education
 
 
 [2]
 The first part of the screening process consists of a two-day classroom tryout
 
 
 [3]
 Judge Metzner found that home instruction provided by "itinerant" teachers is "merely a stop-gap measure at best and is insufficient as a permanent solution to the problems of a majority of the individual plaintiffs."
 
 
 [4]
 We cannot agree with Judge Metzner's reasons for abstention. He decided that abstention was proper because the complaint did not charge deliberate discrimination or a "chilling" of first amendment rights. This is not a case where appellants seek to enjoin a state penal statute while a state criminal prosecution is pending. Compare Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)
 
 
 [5]
 The Board is allowed to contract with private schools for the education of the handicapped. New York Education Law Sec. 4404, subd. 2, par. b
 
 
 [6]
 The complaint asserted a violation of the due process clause and the commerce clause as well as the equal protection clause
 
 
 [7]
 It is no answer to the contention that the district court should have abstained, that appellants did not raise their state claims in their complaint. Appellants cannot be allowed to frustrate the policies underlying the doctrine of abstention by this simple expedient
 
 
 [8]
 The regulations define "special class," Sec. 200.1(c), and provide that "[a]dequate classroom space, facilities and equipment shall be provided for each special class." Sec. 200.3(a) (2). "The formation of special classes, including grouping and numbers, shall depend upon the nature of the children's capabilities, deficits and education, social, or emotional needs." Sec. 200.3(a) (1). Although there are miniimum guidelines in terms of class size, age of children and IQ of children, the details of placement procedure are left to the individual boards of education
 
 
 [9]
 There are presently two cases pending in the Supreme Court of New York for Kings County which may bear heavily on the state claims available to appellants. In Devine v. Board of Education, Index # 2338/1968, plaintiffs alleged that the New York City Board of Education violated Sec. 4404, subd. 2, by failing to provide a special class for Jeffrey Devine, an emotionally disturbed child. In Feldman v. Regents of the State of New York (index # not yet assigned), plaintiffs ("handicapped children") charge both the City and State with failing to comply with Section 3202 of the New York Education Law (granting the right to free public school education) and Article XI of the New York Education Law and with violating the fourteenth amendment right to equal protection of the law. The dispute centers on Section 4407, which provides tuition grants of $2,000 to handicapped children who attend private schools if public school instruction is not available. Although the abstention doctrine does not depend upon the pendency of a state court action, see e. g., Pullman, supra, there is greater reason to abstain when a state court decision may be imminent. Cf. Askew v. Hargrave, supra
 A three-judge district court for the Southern District of New York recently abstained in an action charging that Section 4407 of the New York Education Law violates the equal protection clause. The principal reason advanced for abstaining was that section 4407 is subject to an interpretation which would obviate the equal protection claim. McMillan v. Board of Education, 331 F.Supp. 302 (S.D.N.Y.1971).
 
 
 [10]
 See note 9 supra