ROLLING CLOUD, a/k/a John Hamilton, and Wounded Wolf, a/k/a Rowland Bishop, Individually and on behalf of all other persons similarly situated, Plaintiffs,

Necia W. Hopkins, Intervenor,

v.

Joseph N. GILL, as Commissioner of Environmental Protection of the State of Connecticut, et al., Defendants,

Virginia Damon et al., Intervenors.

Civ. No. H–75–65.

United States District Court,
D. Connecticut.

April 29, 1976.

Jerome M. Griner, Hartford, Conn., for plaintiffs and intervening plaintiff Hopkins.

Donald M. Longley and Brian E. O'Neill, Asst. Attys. Gen., Hartford, Conn., (Carl R. Ajello, Atty. Gen. of Conn., Hartford, Conn. of counsel), for defendants.

William R. Breetz, Hartford, Conn., and David C. Crosby, Thomas N. Tureen and Barry A. Margolin, Calais, Maine, for intervenors Damon, et al.

Before SMITH, Circuit Judge, and CLARIE and BLUMENFELD, District Judges.

## MEMORANDUM OF DECISION

J. JOSEPH SMITH, Circuit Judge:

Plaintiffs in the instant action seek to overturn Connecticut's recently adopted statutory scheme for the conduct of the state's Indian-related activities, Conn.Gen. Stat.Ann. § 47–59a *et seq.* (Chapter 824). In particular, plaintiffs seek declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202 and 42 U.S.C. § 1983 on the ground that this state legislation deprives them of several constitutionally-secured rights, including rights premised on the fifth and fourteenth amendments of the Constitution as well as rights based on the prohibition against bills of attainder contained in article I, § 10 of the Federal Constitution.

The immediate issues before this three-judge district court are (1) defendants' motion to dismiss the complaint for lack of standing and (2) defendants' motion for summary judgment.

For the reasons outlined below, we grant the motion to dismiss for lack of standing with respect to original plaintiffs Rolling

Cloud and Wounded Wolf. Those plaintiffs have failed to allege personal injury-in-fact and, accordingly, they lack standing to sue. However, with respect to plaintiff-intervenor Hopkins, who has already submitted to the administrative process established by the statute, we deny defendants' motion on the ground that plaintiff Hopkins does assert sufficient injury-in-fact to continue with this suit.

With respect to the motion for summary judgment, we abstain at the present time from deciding the substantive constitutional issues raised by the plaintiffs. We hold our proceedings in abeyance so that plaintiff-intervenor Hopkins may have an opportunity to present her state law claims before the courts of the State of Connecticut.

## I. THE PARTIES

There are four sets of parties in this litigation at the present time. The original plaintiffs, Rolling Cloud, a/k/a John Hamilton, and Wounded Wolf, a/k/a Rowland Bishop, initially filed an action on behalf of themselves and a class designated as "all natural persons descended from the original red inhabitants and occupants of lands located now within the borders of the State of Connecticut." Named as an original defendant in this suit was Joseph Gill who, in his capacity as Environmental Protection Commissioner of the State of Connecticut, has responsibility for administering parts of the statutory scheme complained of here. Named as Gill's original co-defendants were the present members of the Connecticut Indian Affairs Council, appointed pursuant to Conn.Gen.Stat.Ann. § 47–59b.

When questions were raised as to the legal standing to sue of the original plaintiffs, Ms. Necia W. Hopkins, secretary of the New England Coastal Schaghticoke Indian Association, Inc., was permitted to plead as a plaintiff-intervenor. Ms. Hopkins, unlike the original plaintiffs, has applied for administrative certification of her Indian status under the statutory procedure complained of here and has had her claim rejected.

In addition to Ms. Hopkins' intervention, a group of Connecticut Indians seeking to uphold the challenged legislation has been admitted to the litigation as defendant-intervenors. Defendant-intervenors are represented by attorneys from the Indian Unit of Pine Tree Legal Assistance and the Native American Rights Fund, two groups which specialize in the type of litigation presented here.

## II. THE STATUTORY SCHEME

The Connecticut statute presently governing Indian affairs was adopted by the General Assembly in 1973. See Conn.Gen. Stat.Ann. § 47–59a, *et seq.* (pocket supplement). This legislation, passed by the Assembly as P.A. 73–660, made several significant changes in the pre-existing scheme of Indian rights.

First, the statutory term "Indian" was explicitly defined to encompass only those individuals who are of at least one-eighth blood of "qualified Connecticut tribes." Five tribes (Mohegan, Golden Hill, Schaghticoke, Western Pequot and Eastern Pequot) are given this "qualified" status by the statute. In addition, the Indian Affairs Council, described in more detail immediately below, is given the authority to expand the list of "qualified" tribes to include additional groups. Indians who are not members of "qualified" tribes are not, for the purposes of Connecticut law, entitled to the rights or privileges afforded to "Indians." Conn.Gen.Stat.Ann. § 47–59a. While the Council may expand the definition of qualified tribes beyond its statutory scope, it may not narrow the definition to exclude tribes or individuals defined as "Indians" by the statute. Conn.Gen.Stat.Ann. §§ 47–63, 47–59b(b).

Second, the new statute establishes, for the first time, the Indian Affairs Council referred to above. Conn.Gen.Stat.Ann. § 47–59b(a). Prior to the creation of this Council, Indian activities in Connecticut were confided exclusively to the state Commissioner of Welfare. See 1961 P.A. 304, § 4, codified as Conn.Gen.Stat.Ann. § 47–59 (now repealed). The new Council consists of three gubernatorial appointees (who must be non-Indians) and one representative from each of the five "qualified" tribes recognized by the statute.

Three functions of the Council are of direct importance to this litigation.[1] First, the Council, as mentioned above, has the authority to expand the list of "qualified" tribes entitled to the special protection of Connecticut law. Second, the Council is empowered to make administrative findings of fact to determine which particular individuals claiming Indian status meet the legal requirements and are in fact "Indians" for the purposes of Connecticut law.

In making such factual determinations, the Council must recognize Indian status for anyone who can prove his qualifications under the statutory definition (*i. e.,* one-eighth Mohegan, Golden Hill, Schaghticoke, Western Pequot or Eastern Pequot blood) as well as anyone who falls within the supplemental standards adopted by the Council. Individuals who fail to receive the Council's administrative certification of their Indian status are prevented from using reservation lands which, as explained below, are set aside for the exclusive use of "qualified" Indians.

Third, the Council is empowered to decide "who is eligible to reside on [Indian] reservation lands" maintained by the State of Connecticut. Conn.Gen.Stat.Ann. § 47–59b(b). The Council's decisions are restricted by the requirement that, excepting non-Indian persons who resided lawfully on the reservations as of July 1, 1973, only "Indians" (as defined statutorily and administra-

---

1. In addition to the functions which gave rise to this lawsuit, the Council performs three other tasks under the new statutory scheme. First, it is to provide (undefined) "services" and "programs" to Indians living on Connecticut reservations. Second, it is to review proposed administrative regulations concerning statewide Indian affairs and give advice with respect to such regulations. Third, the Council is to make an annual report on the status of Indian affairs in Connecticut. Conn.Gen.Stat. Ann. § 47–59b(a) and (c).

tively) are to reside on reservation lands. If, however, an Indian has a spouse or child who is non-Indian for the purposes of the Connecticut statute, the Indian's family is allowed to reside on the reservation with the Indian for the duration of the Indian's lifetime. Upon the death of said Indian, the non-Indian family must leave the reservation, receiving compensation from the state for any real property they may leave behind. Conn.Gen.Stat.Ann. § 47–64(a).

The statute also contains a broadly-worded affirmation of Indian rights (as yet undefined) to these reservation lands. Conn. Gen.Stat.Ann. § 47–59a.

In accordance with an apparent assumption that intermarriage will eventually lead to the dissolution of the Connecticut Indian community, the statute provides for the eventual "escheat" of reservation lands to the State of Connecticut. Conn.Gen.Stat. Ann. § 47–64(c).

Finally, the statute gives to the Commissioner of Environmental Protection the responsibility for the "care and management" of the reservations and the Indians who reside thereon. The Commissioner and the Council are to promulgate jointly such regulations "as are necessary to insure the general health, safety, and well-being" of Indians residing on reservation lands. Conn.Gen.Stat.Ann. § 47–65. In addition, the Environmental Protection Commissioner is given authority to manage and expend tribal trust funds in accordance with the advice of the Indian Affairs Council. Conn. Gen.Stat.Ann. § 47–66.

## III. PLAINTIFFS' CLAIMS

### A. *The original plaintiffs*

In their complaint, original plaintiffs Rolling Cloud and Wounded Wolf assert that the statutory scheme outlined above violates four constitutional provisions: (1) the fourteenth amendment's equal protection clause, (2) the fourteenth amendment's due process clause, (3) the fifth amendment's prohibition of takings without just compensation and (4) the article I, § 10, clause 1 prohibition on bills of attainder.

The first of plaintiffs' fourteenth amendment claims asserts that the legislation complained of creates a constitutionally-suspect classification based on race, and thereby deprives plaintiffs of the equal protection of the laws. Since the statute distinguishes between Indians (who receive benefits) and non-Indians (who do not), and since racial (*i. e.,* tribal) lineage determines to which classification an individual belongs, plaintiffs assert that the statutory scheme makes an explicit distinction between Indians and non-Indians based on race.

Plaintiffs next assert a fourteenth amendment due process claim based on the deprivation of alleged pre-existing property rights in reservation lands. According to plaintiffs' theory, the law in effect prior to the passage of P.A. 73–660 in 1973 accorded them the unqualified right as Indians to use and reside upon reservation land. The new statutory scheme allegedly impairs these pre-existing rights in two ways. First, the plaintiffs must now prove to the satisfaction of the Council that they are, in fact, Indians within the legal definition of the term. Prior to P.A. 73–660, plaintiffs claim, their access to reservation lands was established and unquestioned. The new law allegedly deprives them of a property interest by requiring them to submit to administrative factfinding before using reservation lands again.

Second, even if the plaintiffs are recognized by the Council as "Indians" for the purposes of Connecticut law, the Council has the power to prevent them from residing permanently on the reservation lands. Under the new law, no Indian can automatically reside on the reservations as a matter of right. Instead, the Council has the authority to determine ·which Indians shall live on the reservations. Plaintiffs argue that the existence of the Council's authority in this matter deprives them of property rights without due process since the statute fails to establish clear and ascertainable standards for deciding administratively which Indians shall and shall not be granted permission to live on the reservations.

The original plaintiffs' claim under the bill of attainder clause, article I, § 10, clause 1, rests on essentially the same facts as the due process argument outlined above. The requirement that individuals be certified as Indians by the Council before using state lands and the alleged lack of statutory standards for the Council's determinations as to which Indians shall reside on the reservation constitute the asserted violation of article I, § 10, clause 1. The alleged absence of judicial appeal from the Council's decisions, the absence of statutorily-based procedures governing the conduct of the Council's deliberations and the alleged absence of the "safeguards of a trial" in these administrative determinations are all said to violate the constitutional prohibition on bills of attainder.

Finally, plaintiffs assert that the statutory provisions for the eventual "escheat" of reservation lands to the state constitute a "taking" without just compensation in violation of the fifth amendment and the due process clause of the fourteenth amendment.

### B. *The plaintiff-intervenor*

Four of plaintiff-intervenor Hopkins' constitutional claims are identical to those of the original plaintiffs discussed above. However, Ms. Hopkins, in her complaint of May 12, 1975, also asserts that the meeting of the Connecticut Indian Affairs Council, which rejected her application for Indian status, violated the state statute establishing the Council in several respects. She argues that these statutory violations create a federal due process claim.

Plaintiff Hopkins argues, first, that the members of the Indian Affairs Council representing the Schaghticoke and Mohegan tribes are not members of the tribes which they purport to represent. Indeed, Ms. Hopkins argues that these "representatives" have not been selected for the Council by the tribes they allegedly represent and that the Connecticut Indian Affairs statute does not even provide a mechanism for the selection of tribal representatives.

Plaintiff Hopkins argues that the meeting of the Council which rejected her application was statutorily illegal in other respects. She claims that participants in that meeting included alternate delegates to the Council and legal counsel for some of the tribal representatives. The statute, plaintiff Hopkins argues, does not authorize participation in Council meetings by either alternate representatives or legal counsel and, thus, the meeting which denied her Indian status was illegal.

Plaintiff Hopkins also asserts that the Connecticut statute fails to give the Council "ascertainable standards" for its determinations as to which applicants are bona fide Indians for the purposes of Connecticut law. Ms. Hopkins argues, first, that the statutory definition of an Indian is ambiguous (". . . at least one-eighth Indian blood of . . . [the] Eastern Pequot, Western Pequot, Schaghticoke, Golden Hill [or] Mohegan [tribes]" and therefore provides no effective guidance for the Council in its determinations. She argues, second, that since the Council's power to supplement the statutory definition, and thereby expand the number of "qualified" Indians, is not guided by any discernible standards, the Council is free to define as an Indian anyone whom it chooses.

Plaintiff Hopkins further contends that the fact-finding procedure used by the Council when it rejected her application required her to assume the burden of proving her Indian lineage. This, she maintains, violated the provisions of P.A. 73–660 which allegedly removed the burden of proof from the applicant Indian. (See annotation following Conn.Gen.Stat.Ann. § 47–64).

Finally, plaintiff Hopkins claims that, subsequent to the Council meeting which found her of non-Indian lineage, she has been formally, and effectively denied the use of reservation lands for recreational and social purposes. In one instance, she claims, state police entered onto reservation lands with the intent of arresting her pursuant to the findings of the Indian Affairs Council. This, Ms. Hopkins asserts, violates

the terms of P.A. 73–660 since that statute gives the Council the power to regulate only residential access to the reservations, not access for social or recreational purposes.

All of these statutory violations, Ms. Hopkins asserts, violate the "minimum requirements of fair play" mandated by due process and, in their cumulative effect, entitle her to declaratory and injunctive relief under 42 U.S.C. § 1983.

## IV. STANDING

### A. *The original plaintiffs*

■ The original plaintiffs in the instant action, Rolling Cloud and Wounded Wolf, lack legal standing to continue with this suit. Standing requires an actual or threatened injury to the party seeking to maintain the cause of action. Rolling Cloud and Wounded Wolf have not alleged such injury-in-fact and, hence, lack standing to continue this litigation. *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 216, 94 S.Ct. 2925, 2929, 41 L.Ed.2d 706, 715 (1974); *Data Processing Service v. Camp,* 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184, 187 (1970); *Barlow v. Collins,* 397 U.S. 159, 167–68, 90 S.Ct. 832, 838, 25 L.Ed.2d 192, 199–200 (1970) (concurring opinion of Justice Brennan); Wright & Miller, *Federal Practice and Procedure: Civil* § 1542.

Neither plaintiff has yet applied for certification of his Indian status. Hence, neither can demonstrate any palpable injury from the existence of the Indian Affairs Council. They have not alleged that access to reservation lands has in fact been denied them because of the absence of certification. They have not even alleged that they will be denied Indian status by the Council, or that they will be denied access to tribal lands at a future date.

When plaintiffs' assertion of injury is stripped to its essentials, their alleged "injury" is the mere existence of the statute and its administrative machinery. Plaintiffs appear to be arguing that the passage of the statute and the seating of the Council per se injures them.

Whatever "injury-in-fact" might mean, it must involve something more than the mere existence of the statute complained of. If the mere existence of the legislation and the Council were sufficient to confer standing, then the "injury" requirement would indeed be superfluous. Such "injury" would always exist any time potential plaintiffs challenged a law that was on the books. *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), interprets the "injury-in-fact" requirement rather strictly in constitutional litigation, and reaffirms the jurisdictional and prudential principles underlying that requirement. Neither of these plaintiffs has alleged "specific, concrete facts demonstrating that the challenged practices harm *him,* and that he personally would benefit in a tangible way from the courts' intervention." *Warth,* 422 U.S. at 508, 95 S.Ct. at 2210, 45 L.Ed.2d at 360.

Rolling Cloud and Wounded Wolf attempt to ignore the ephemeral nature of their asserted injuries by invoking the principle that plaintiffs ordinarily need not exhaust state remedies before resorting to the federal courts in § 1983 cases. *See, e. g., Allee v. Medrano,* 416 U.S. 802, 814, 94 S.Ct. 2191, 2199, 40 L.Ed.2d 566, 579 (1973); *Damico v. California,* 389 U.S. 416, 417, 88 S.Ct. 526, 19 L.Ed.2d 647, 648 (1967); *Monroe v. Pape,* 365 U.S. 167, 183, 81 S.Ct. 473, 481, 5 L.Ed.2d 492, 502 (1961). This principle, however, does not serve to excuse plaintiffs from demonstrating injury-in-fact.

■ The suspension of the exhaustion requirement for § 1983 suits does not establish a corollary suspension of the requirement of injury-in-fact. The suspension of the exhaustion requirement only means that, after injury-in-fact has occurred or is threatened, plaintiffs ordinarily need not first seek redress from state procedures. They may instead proceed directly to the federal courts. *See generally Morgan v. LaVallee,* 526 F.2d 221 (2d Cir. 1975).

However, for standing in the resulting federal action, plaintiffs must still allege the initial injury-in-fact which has sent

them to the federal courts. Judicial doctrines with respect to the exhaustion of state remedies pertain to plaintiffs' remedies after injury-in-fact has been sustained. Absent such initial injury, plaintiffs lack standing to maintain a law suit.

Plaintiffs cite *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), in an effort to buttress their claim to standing. In *Bolton*, Georgia physicians were held to possess standing to challenge Georgia's state statute prohibiting abortion. Standing was accorded to the plaintiff-physicians even though none of them had been prosecuted for performing illegal abortions. The Supreme Court held that the possibility of such prosecution had a sufficiently injurious "chilling effect" upon the doctors' professional conduct (*i. e.*, they were deterred from advising patients to have abortions) to afford the physicians standing to challenge the Georgia statute.

The *Bolton* decision is distinguishable from the present case on three grounds. First, Rolling Cloud and Wounded Wolf do not allege a similar "chilling effect" upon the exercise of any constitutional rights as a result of P.A. 73–660. Nowhere do plaintiffs claim that they (like the Georgia doctors) suffer damaging intimidation in the exercise of their constitutional rights as a result of the Connecticut statute challenged here.

Second, Rolling Cloud and Wounded Wolf (unlike the physician-plaintiffs in *Bolton*) can challenge the Connecticut Indian affairs statute without risking criminal prosecution. Had standing been denied to the plaintiff-doctors in *Bolton*, the only possible opportunity to assert their constitutional rights would have been in a criminal prosecution under the challenged statute. Rolling Cloud and Wounded Wolf, in contrast, can challenge the Connecticut statute without risking criminal prosecution. All they need do is submit to the civil, administrative processes of the Indian Affairs Council. Indeed, the history of plaintiff-intervenor Hopkins, discussed below, demonstrates that here, unlike *Bolton*, it is possible to

meet the injury-in-fact requirement without submitting to criminal prosecution.

Third, the plaintiffs in *Bolton* were raising first amendment claims. It has long been recognized that first amendment rights are deserving of particular solicitude in decisions on standing. See *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) and cases cited therein at 11, 92 S.Ct. at 2324, 33 L.Ed.2d at 162. Rolling Cloud and Wounded Wolf do not purport to protect first amendment interests in this litigation and thus are not entitled to the same judicial generosity afforded the plaintiffs in *Bolton*.

In short, the original plaintiffs do not allege either actual or threatened injury-in-fact and thus lack standing to maintain the present action. Hence, defendants' motion to dismiss for lack of standing is granted with respect to this first set of litigants.

### B. *The plaintiff-intervenor*

■ Plaintiff-intervenor Hopkins, in contrast, does have standing to maintain the present lawsuit. Ms. Hopkins has applied to the Council for certification as a "qualified" Indian and has been denied such certification. She has received a communication from the Council, pursuant to its disposition of her application, ordering her to cease using reservation lands. Ms. Hopkins claims that she has actually and lawfully used these lands in the past and that compliance with the Council's order will deprive her of continued use of these lands in the future.

Such actions on the part of plaintiff-intervenor Hopkins and the Council suffice to establish the requisite injury-in-fact for standing. By virtue of the Council's denial of her Indian status and the subsequent administrative prohibition on her use of reservation lands, Ms. Hopkins has sustained injury-in-fact which affords standing as a plaintiff in the instant action. The motion to dismiss for lack of standing is denied with respect to the plaintiff-intervenor.

## V. THE MOTION FOR SUMMARY JUDGMENT

We deny, without prejudice to renewal, defendants' motion for summary judgment at the present time. We retain jurisdiction over the federal claims raised by plaintiff-intervenor Hopkins and abstain from consideration of these issues until the state law questions raised by her intervening complaint have been settled by the judicial processes of the State of Connecticut.[2]

It is a well-established practice for the federal courts, when confronted with lawsuits involving significant, unsettled questions of state law, to postpone their federal proceedings while the state courts resolve the relevant issues of local law. *Thompson v. Magnolia Co.*, 309 U.S. 478, 483, 60 S.Ct. 628, 630, 84 L.Ed. 876, 880 (1940). The case for such postponement is particularly strong when the state law issues are novel and when the resolution of the state law issues might eliminate the need for reaching difficult constitutional questions. *Colorado River Water Conservation District v. United States*, — U.S. —, —, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483, 495 (1976); *Harris County Commissioner's Court v. Moore*, 420 U.S. 77, 82, 95 S.Ct. 870, 874, 43 L.Ed.2d 32, 38 (1975); *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

The case at bar presents us with a situation where such deference to the state courts is warranted. Ms. Hopkins raises several colorable claims under Connecticut law. See § IIIB, *supra*. It is quite possible that the resolution of these claims will terminate this controversy, and thereby obviate the need for this court to confront plaintiff's constitutional arguments.

Among her claims in this litigation, plaintiff-intervenor Hopkins asserts that she is not allowed any state judicial review of the decisions of the Indian Affairs Council. However, as the defendants point out, the Connecticut Administrative Procedure Act may permit review of the Council's actions in the state courts. Conn.Gen.Stat.Ann. § 4–166, *et seq.* Whether such state court review is available to Ms. Hopkins under the Administrative Procedure Act depends upon the construction of § 4–166(1) of the Act. If the Indian Affairs Council is an "agency" within the meaning of the Act, then the state courts are available for review of Council decisions and Ms. Hopkins' claim based on the asserted absence of such review fails.[3]

The presence of this state law issue makes this a textbook case for abstention. The Connecticut Administrative Procedure Act has been in force less than four years, and the state courts have had only a few opportunities to construe it. Similarly, the statutory scheme for regulating Indian Affairs has been in force for only two years, and has not been the subject of a single

**2.** It is, of course, not surprising that Ms. Hopkins' federal claims are intertwined with issues of state law. While the powers of the federal government are pre-eminent in the area of Indian affairs, the states also "play a substantial role with respect to the Indians" within their borders. *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 678, 94 S.Ct. 772, 783, 39 L.Ed.2d 73, 85 (1974). See, also, *Tuscarora Nation of Indians v. Power Authority*, 257 F.2d 885, 889 (2d Cir. 1958).

**3.** The pertinent sections of the Connecticut Administrative Procedure Act read as follows:

"Agency" means each state board, commission, department, ` . . . authorized by law to make regulations or to determine contested cases. § 4–166(1).

The validity or applicability of a regulation or order of an agency may be determined in an action for declaratory judgment brought in the court of common pleas for Hartford county, if the regulation or order, or its threatened application, interferes with or impairs, or threatens to interfere with or impair, the legal rights or privileges of the plaintiff. § 4–175.

A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision in a contested case is entitled to judicial review . . . . § 4–183(a).

An aggrieved party may obtain a review of any final judgment of the court of common pleas under this chapter by appeal to the supreme court. . . . § 4–184.

For the most recent construction of these provisions, see *Wagner v. Connecticut Personnel Appeal Board*, Conn., 37 Conn.L.J.No.43 at 10 (Apr. 20, 1976).

state court decision. Thus, unless we abstain, this court will be forced to predict the eventual answer to an important and unsettled issue of Connecticut law: whether the Indian Affairs Council comes within the coverage of § 4–166(1).

The Supreme Court's recent decision in *Boehning v. Indiana State Employees Association*, 423 U.S. 6, 96 S.Ct. 168, 46 L.Ed.2d 148, 44 U.S.L.W. 3275 (1975), is precisely on point. There the Court upheld abstention. In *Boehning*, the issue was whether the Indiana Administrative Adjudication Act was applicable, and thus permitted a hearing before termination of the plaintiff's employment. Here the issue is whether Connecticut's Administrative Procedure Act is applicable, permitting judicial review of the Council's decisions.

Under these circumstances, abstention is clearly warranted. And, if the state courts construe the Act to permit judicial review by the state court system, the plaintiff-intervenor will be able to raise her other state law claims there.

Notwithstanding the compelling arguments for abstaining at this stage of the litigation, Ms. Hopkins points to such decisions as *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and *McNeese v. Board of Education*, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963), and argues, on their authority, that she cannot be sent to the Connecticut courts for the continuation of this lawsuit.

*Monroe* and *McNeese*, of course, held that a litigant who sues under 42 U.S.C. § 1983 has a right to proceed in the federal courts without first exhausting state remedies. Plaintiff Hopkins is a § 1983 litigant, and thus she argues that *Monroe* and *McNeese* prevent this court from denying her a federal forum at the present time.

Subsequent Supreme Court decisions have made it clear that the *Monroe* no-exhaustion-of-state-remedies doctrine only applies in three situations. First, if the remedies available at state law are inadequate, *Monroe* permits a § 1983 plaintiff to proceed directly to the federal courts without first seeking relief from the state judiciary.

Second, if the § 1983 plaintiff has no substantial state law claims, *Monroe* prevents referral back to the state courts and guarantees the plaintiff a federal forum in the first instance. *Zwickler v. Koota*, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

Third, if the only state law claims available to the plaintiff are predicated on mere "counterparts" of federal constitutional provisions, *Monroe* and *McNeese* assure the plaintiff of a federal forum. *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); *Reid v. Board of Education of City of New York*, 453 F.2d 238 (2d Cir. 1971). A § 1983 plaintiff cannot be forced to adjudicate his case in a state court when his only basis for relief in state law is a "provision of the state constitution" "similar" to a federal constitutional clause. *Harris County*, 420 U.S. at 84, n. 8, 95 S.Ct. at 875, 43 L.Ed.2d at 39.

Thus, for a § 1983 plaintiff, such as Ms. Hopkins, to be immunized from the application of the abstention doctrine, it is necessary for that plaintiff's claims to fall within one of the three categories under the protection of *Monroe*. *See also Askew v. Hargrave*, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971); *McRedmond v. Wilson*, 533 F.2d 757 (2d Cir. 1976). Ms. Hopkins' legal claims do not come within any of these categories.

First, Ms. Hopkins cannot assert that her state remedies are inadequate since the status of Connecticut law on this point is, as we noted above, quite unclear. We do not know if Ms. Hopkins has available to herself the remedies of the Connecticut Administrative Procedure Act since we do not yet know if the Council is an "agency" within the meaning of the Act. Until there is an indication that the Act does not afford Ms. Hopkins a state law remedy, we cannot say that she falls within this first class of litigants protected by *Monroe*.

Second, Ms. Hopkins does present significant state law claims. See § IIIB, *supra*. And, third, these claims are not based on mere "counterparts" of federal constitutional provisions, but are based on a variety of state statutory provisions.

▆▆▆▆▆▆▆

In short, Ms. Hopkins cannot claim that *Monroe* forbids our abstention in this case since her claim does not place her within one of the three categories protected by *Monroe.* Accordingly, not *Monroe*, but *Harris County* and *Pullman* are controlling here, and those cases teach us that abstention is appropriate in this context.

▆ When a federal court chooses to invoke the abstention doctrine, and thereby return a legal controversy to the state courts, it must assess a variety of considerations: the requirements of comity, the desirability of avoiding constitutional issues, the degree of ambiguity in the state laws in question, the need for federal protection of plaintiffs' rights. After weighing these competing factors, the court must decide whether abstention and referral is proper on the facts of that particular case. *Colorado River Water Conservation District*, supra at ——, 96 S.Ct. at 1244, 47 L.Ed.2d at 495.

▆ The Supreme Court has stated, quite explicitly, that abstention is most appropriate when it affords the state courts an opportunity to immunize from federal constitutional challenge "an entire legislative scheme of regulation" such as that being challenged here. *Hostetter v. Idlewild Liquor Corp.*, 377 U.S. 324, 329, 84 S.Ct. 1293, 1296, 12 L.Ed.2d 350, 354 (1964). Plaintiffs' avowed purpose in the instant action is to invalidate the extensive statutory framework for the conduct of Connecticut's Indian affairs.

This, then, would appear to be a situation for abstention, where the construction and application of a new state statute might avoid the need for constitutional adjudication by a federal court. Accordingly, deference to state authorities is most proper at this stage of this litigation.

Hence, we deny without prejudice defendants' motion for summary judgment and thereby postpone our consideration of plaintiff-intervenor's constitutional claims. Plaintiff-intervenor Hopkins should, in the meantime, present her state statutory claims to the appropriate judicial bodies of the State of Connecticut. If, after adjudication of the state law claims, federal constitutional issues remain, this court will proceed accordingly.

The foregoing may serve as the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

SO ORDERED.